[Filed November 15, 1887.]

**W. S. POWELL ET AL., APPELLANTS, v. WILLAMETTE VALLEY RAILROAD COMPANY ET AL., RESPONDENTS.**

FRAUD—ATTORNEY AND CLIENT—WHAT CONSTITUTES—DIRECTORS OF INSOLVENT CORPORATION.—Third parties employed an attorney of an insolvent corporation, who was also a director therein, to buy up the claims of creditors of the said corporation, the purpose thereof being to re-organize the concern. *Held*, that the relation of the attorney to the company required of him the utmost good faith towards the said creditors in his said dealings with them; but where they received all that their claims were worth, the fact that they were not informed of the contemplated re-organization would not constitute a fraud upon them on the part of the said attorney.

STOCK IN CORPORATION—SALE OF—WHAT CONSTITUTES—LIABILITY OF PURCHASER OF UNPAID.—Under the laws of this State (Hill's Code, ? 3230), all sales of stock in a corporation subject the purchaser to the payment of any unpaid balance due on said stock. A debtor to the company conveyed his stock to a trustee, to sell the same to any person who would pay his indebtedness to the corporation therefor. *Held*, that this was no sale, and the trustee was not such purchaser as would incur a liability under said statute.

APPEAL from Multnomah County. Affirmed.

*James K. Kelley*, for Appellants.

*Dolph, Bellinger, Mallory & Simon*, and *Ellis G. Hughes*, for Respondents.

THAYER, J.—This appeal comes here from a decree of the Circuit Court for the county of Multnomah. The case has been here before on appeal from a decision overruling a demurrer. It is reported in 13 Or. 446, and the material parts of the complaint are there set out. The main facts in the case are, that the

Dayton, Sheridan & Grand Ronde Railroad Company, a private corporation, incurred separate debts to the appellants respectively, which it was unable to pay, and in order to secure their payment, conveyed to the Willamette Valley Railroad Company, one of the respondents herein, in consideration of that company agreeing to pay said debts, all its property; that the latter company, in order to secure these debts, made a mortgage to one William M. Evans, as trustee, covering all the property that had been conveyed to it by the former company, and conditioned for the payment of the several debts due the several appellants; and in accordance with the terms of said mortgage, issued and delivered to each appellant a separate certificate, stating the amount due him under the mortgage on account of his debt due him from said Dayton, Sheridan & Grand Ronde Railroad Company; that the respondent Hughes, acting for certain parties who contemplated the formation of a company in Scotland to supersede the above-named companies in the business of operating and managing their railroads, purchased of the appellants their said debts at fifty cents upon the dollar; that said parties subsequently organized a company, known as the Oregonian Railway Company, Limited (also one of the respondents herein), and the said property was transferred to it, having first, however, been transferred to an intermediate company, known as the Oregon Railway Company, Limited (another of the respondents), and which was organized to receive and hold the same until the Oregonian Railway Company, Limited, could be organized in Scotland; and that Hughes, acting under a writing from one Joseph Gaston, also sold and transferred to said Oregonian Railway Company, Limited, five thousand shares, at the par value of five hundred thousand dollars, which had been subscribed by said Gaston, of the capital stock of said Willamette Valley Railroad Company, all of which was unpaid, and which was at the time in the hands of said Hughes to be sold and transferred. In the former case, as will be seen from the report referred to, only the sufficiency of the complaint was considered, and counsel for the appellant contends that the court failed to understand the real principles of the case, but viewed it merely

as a suit to charge Hughes on account of alleged fraudulent misrepresentations it is claimed he made to the appellants when he purchased from them their several claims.

I think counsel substantially correct in that particular; but it will be observed that the complaint charges Hughes with having represented to appellants that certain other creditors of the Willamette Valley Railroad Company had agreed to accept fifty cents on the dollar in full of their claims, and that the latter company was insolvent; and that if they did not accept fifty cents on the dollar, they would get nothing, and that, relying on these representations, they agreed to accept that amount in full; that thereupon said Hughes paid them that amount, and they severally made the assignments to him; that Hughes was at that time director of said Willamette Valley Company, and had been employed by Evans, said trustee, as his attorney to represent the interests of appellants under the said mortgage to Evans, and that said Evans having died, he was the sole representative of their interests under it; that he was the owner of shares of unpaid stock of the Willamette Valley Railroad Company greater in amount than all its debts and liabilities, and was then under an agreement to purchase and obtain control of the property of the latter company, and to sell and deliver the same, and to procure the purchase and delivery of the claims of appellants for the least possible sum, for the joint benefit of himself and other parties then unknown to appellants; that the representations made by Hughes as to the insolvency of the Willamette Valley Railroad Company, and of other creditors, having agreed to take fifty cents on the dollar for their claims, were false; that the money he did pay appellants was not his own, but belonged to parties to whom he had sold the road; that appellants were ignorant of the facts relative to his sale of the road, and to whom he had sold it, and as to his ownership of capital stock, and were at the time, by reasons of the relations of trust and confidence in him, relying upon him to protect their interests, and by reason of these matters, Hughes did defraud them of fifty cents on the dollar of their claims.

It will also be seen that in the prayer for relief the court was

asked to decree that Hughes pay the said claims. The prayer, however, is in the alternative in that respect. In view of these allegations and prayers for relief, the court might easily mistake the case as a suit to recover a personal decree against Hughes on account of the alleged fraudulent misrepresentations, it is claimed, he made to the said appellants. Besides, the counsel's attitude, when here before, with the allegations referred to, confessed by the demurrer, was quite different from what it is after the facts have been tried, and the findings made that the charges of false representations are untrue. They now graciously disclaim any reliance upon any actual fraud committed by Hughes, but insist that he is chargeable with constructive fraud.

*Dealings of a fiduciary character.* In other words, that Hughes, having been director, and the attorney of the Willamette Valley Railroad Company, at the time the claims were purchased from appellants, as found by the referee, rendered the purchase fraudulent and void as a matter of law. This is an important question in the case, for, unless the appellants can be relieved from their sale of the claims, unless their sale of them can be nullified, they have no standing in court. Conceding that their suit is well brought, whether Hughes acting the part he did in the purchase of the claims is fraudulent or not, depends, in my opinion, upon the nature of the transaction and the effect of it upon the appellants. I do not believe that his relations to the appellants on account of the positions he held in said company necessarily prevented him from negotiating a purchase of said claims for himself, and much less for other parties. In the first place, he may have acted with the strictest integrity to the appellants, and in the second, it may have been an advantage to them instead of an injury.

An attorney at law holds as sacred a relation to his client as can be formed in the business relations of life, yet his dealing with the client is not necessarily fraudulent, though it devolves upon him to establish that he acted honestly and fairly, whenever his good faith in the transaction is called in question. (*Bingham* v. *Salene,* 14 Pac. Rep. 523.) If Hughes did maintain a relation of trust and confidence to the appellants in regard

to their claims, it does not conclusively follow that he intended to defraud them by purchasing the claims at a discount, nor that they were defrauded thereby. If they realized for them all that could reasonably be expected under the circumstances—realized as much as they would if they had retained them—I do not see any tenable grounds upon which they can recover against him, or can claim that they were injured in consequence of what he did.

The referee, to whom the case was referred to find the facts, has found that the Willamette Valley Railroad Company was, at the time of the purchase of the claims, insolvent and unable to pay its debts; that all its property was subject to mortgage liens prior to the mortgage or trust deed made to Evans; that the prior liens amounted to about one hundred and fifteen thousand dollars, and were in process of foreclosure by suit then pending; and that it was generally believed at the time that all of said property was of no greater value than the amount of the prior liens. If that finding be correct, what hope or expectation was there that the appellants would realize anything unless they did sell the claims upon the terms proposed by Hughes, or what has since been developed to convince any one that they would have obtained anything therefor if they had retained them. Strip the case of the alleged misrepresentations of Hughes, and it is fully established that the appellants received even more than their claims were worth, unless his liability on the Gaston stock is taken into consideration. I think it apparent to any one that the appellants made an advantageous deal with their claims, unless they could have made Hughes liable upon the stock referred to. Upon that feature of the case, two questions are suggested: (1) As to the duty of Hughes to inform appellants of his relations to the said stock, and liability thereon; and (2) as to whether he was under any liability to appellants in consequence of the relation he held to the stock.

Appellants' counsel insist that directors of corporations have no right under any circumstances to use their official positions for their own benefit, or for the benefit of any one except the corporation itself, and that the powers and management vested

in the directors of an insolvent corporation, which has ceased to carry on business, are solely powers to manage assets in trust for its creditors, and for their benefit; that these powers are held in trust by them for all the creditors; that directors or managing agents, who originally stood in a fiduciary relation to the company, become placed, after insolvency, in a fiduciary relation to its creditors; that the law will not permit an officer of a corporation to purchase claims against the corporation, and assign them to a firm of which he is a member; that a purchase by a trustee from his *cestui que trust* under any circumstances is voidable, and will be set aside on behalf of the beneficiary, and that it is not material that there should be an advantage or profit arising out of the purchase from the *cestui que trust;* that it is enough to show the relation and the purchase. I think the counsel in the main are correct in these several positions.

I have no doubt but that the propositions they assert are true in certain cases, but I doubt very much whether they are applicable throughout to the case under consideration, or that the proposition that a purchase by a trustee from his *cestui que trust* under any circumstances is voidable and will be set aside, can be maintained under the broad statement in which it is made. Mr. Pomeroy, in his work on Equity Jurisprudence, section 957, lays down the rule correctly. He there says that "there are two classes of cases to be considered, which are somewhat different in their external forms, and are governed by different special rules, and which still depend upon the single general principle. The first class includes all those instances in which the two parties consciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealings some conveyance or contract or gift. To such cases the principle literally and directly applies. The transaction is not necessarily avoidable, it *may* be valid; but a presumption of its invalidity arises which can only be overcome, if at all, by clear evidence of good faith, a full knowledge, and of independent consent and action. The second class includes all those instances in which one party, purporting to act in a fiduciary character, deals with himself in his private and

personal character, without the knowledge of his beneficiary; as where a trustee or agent to sell, sells the property to himself. Such transactions are voidable at the suit of the beneficiary, and not merely presumptively or *prima facie* invalid. Nevertheless this particular rule is only a necessary application of the single general principle. The circumstances show that the act could not possibly be the good faith, knowledge, and free consent required by the principle, and therefore the result which is a rebuttable presumption in the first class of transactions, becomes a conclusive presumption in the second."

It requires no extraordinary discrimination to determine that the case under consideration, if regarded in the light of a trust, falls within the first class above mentioned. It is a case where the parties have "consciously and intentionally dealt with each other," and not a case "in which one party, purporting to act in a fiduciary character, deals with himself in his private and personal character, without the knowledge of his beneficiary." It is not a case where a trustee, admitting Hughes to have been a trustee, has disposed of property belonging to a beneficiary, nor where a trustee has purchased property of a beneficiary belonging to the latter. Hughes was not in charge of the appellants' claims. The latter had them, with full power to sell them or keep them; and if they chose to sell them to Hughes, and the transaction was fair, they have no grounds upon which to demand that the sale be set aside. Hughes' position in the debtor company, as director and attorney, required him especially, in his dealings with appellants, to maintain the utmost good faith, and I think the proof shows that he did so; and further than that, he did them a substantial favor when he assisted in the negotiation and purchase of their claims at fifty cents on the dollar; and most all of them who testified in the case, about eighteen or twenty of them, seem to be under that impression, and to express satisfaction at the result of the transaction. They had been informed, evidently, that they had a claim for the remainder of their debts, and, of course, were anxious to recover it, but did not pretend that Hughes, or those for whom he acted, had done anything in the affair of which they could complain;

and it does not take more than half an eye to see that they got out of the affair more than they could have reasonably expected in the condition it was in.   They had honest claims, no doubt, against the Willamette Company, and were entitled to have them paid in full; but the company was insolvent—was in the hands of a receiver.

There were liens on the property amounting to one hundred and fifteen thousand dollars prior to theirs, which were in process of foreclosure, and how could they have expected to even realize anything, and, in my opinion, never would, had it not been for some over-credulous Scotchman who evidently had more money than discretion.   The latter conceived the idea of forming a new company to carry out the objects of the two defunct affairs, which were then wrecks.   They engaged Mr. William Ried to purchase up the claims, and to get possession of the outstanding stock; Mr. Ried employed Mr. Hughes to conduct the matter.   Hughes, as a matter of course, did not go and tell the creditors of the particulars of the scheme, if he knew them.   He claims he did not know them, and I believe the referee has found that he did not.   The evidence may warrant the finding, but I am too well acquainted with Mr. Hughes, and naturally too skeptical to believe that he was ignorant concerning the matter. But it made no difference his not telling them.   If he had done so, they would more than likely have become excited, and, if possible, have frustrated the plan, and have done themselves a serious injury financially.   I think it was prudent in his not telling them.   They knew he was acting in the matter for other parties, and that he was buying the claims with the funds of such parties; and that they had a recourse upon the subscribers for stock in the Willamette Company that had not been paid up. They may not have known that Hughes held any such stock, and I am not prepared to say that he was obligated to tell them if he did.

*Transfer of stock.*   But, conceding that it was his duty to make known to them the facts upon which appellants now claim he was owner of such stock, and liable thereon, is it true that he was such owner and under any such liability?   The referee

found "that on the twenty-ninth day of December, 1879, at the special instance and request of the defendant E. G. Hughes, acting for and on behalf of William Ried, the agents of the then promoters of the defendant, the Oregonian Railway Company, Limited, J. Gaston, owning and holding a large majority in interest in the capital stock of the Dayton, Sheridan & Grand Ronde Railroad Company, and the Willamette Valley Railroad Company, to wit, one hundred thousand dollars in the first-named corporation, and five hundred thousand dollars in the last-named corporation, executed and delivered to the said Hughes an instrument in writing, of which the plaintiff's exhibit No. 134, in the testimony herein, is a copy; and thereafter, on the tenth day of February, 1880, at the special instance and request of the said Hughes, the said J. Gaston executed and delivered to Hughes an instrument in writing, of which defendant's exhibit No. 241, of the testimony herein, is a copy." The substance of the two instruments in writing is that Gaston, in consideration of, and to procure release and discharge of all debts and liabilities incurred by him in the construction of the said Dayton, Sheridan & Grand Ronde Railroad, assigned to Hughes, as trustee, all his right, title, and interest in and to the stock of that company, and of the Willamette Valley Railroad Company, to have and to hold the same in trust for the use and purpose, to wit, to convey the same absolutely and unconditionally to such person, persons, or corporation as should within a certain time thereafter procure Gaston's full release and discharge of and from such debts and liabilities. This appears to have been, in effect, all the sale there was of said stock from Gaston to Hughes. The instruments were signed only by the former, and the latter obtained no other title to the stock than what was thereby conveyed.

The statute provides that "all sales of stock, whether voluntary or otherwise, transfer to the purchaser all rights of the original holder, . . . . and subject such purchaser to the payment of any unpaid balance, due, or to become due, on such stock; but if the sale be voluntary, the seller is still liable to existing creditors for the amount of such balance, unless the same be duly paid by such purchaser." (Misc. Laws, ch. 7, § 14.)

XV. OR.—26.

Was the transaction between Gaston and Hughes such a sale of the stock, by the former to the latter, as would subject the latter to the payment of the amount due thereon, under said provision of the statute, is the question to be solved. The liability of a purchaser of stock in such cases is statutory; and, unless the transaction between Gaston and Hughes constituted a sale of the stock within the meaning of the statute, such liability did not attach. It is not a case where a person has had stock transferred to him upon the books of the company, and thereby estopped himself from denying his ownership of it. There no sale in fact is necessary in order to charge the transferee. But here the question must be determined wholly upon the effect of the two instruments referred to. If they evidence such a sale of the stock as suggested, then Hughes became liable; otherwise not. The assignment of the stock was to Hughes as trustee, to have and to hold the same in trust for the use and purpose, to convey absolutely and unconditionally to any one who would procure, in a certain time, Gaston's release and discharge from certain debts, etc. This certainly was no sale to Hughes; it was no more than a power to enable him to sell upon certain specified terms. It vested no title in Hughes, more than a power of attorney to dispose of the stock would have done. It did not transfer to Hughes all the rights of Gaston in the stock, or any rights except to look up a purchaser and sell him the stock upon the terms specified in the instruments, nor did it vest in Hughes the ownership of the stock as a trustee; it merely clothed him with a special and limited authority— made him an agent for Gaston to do a particular thing for the latter's advantage.

" Sales of stock," within the meaning of the statute, are transfers of the general legal title. They could not have been meant to be anything less, or the legislature would not have provided that they should operate to " transfer to the purchaser all the rights of the original holder." In this case all the rights of Gaston in the stock remained in him, except so far as they were suspended by force of the said instruments. If Hughes had failed within the time limited in the said instruments to find a person who would procure Gaston's release from said debts and

liabilities, his authority would have ceased, and Gaston's power over the stock been restored to its former extent. How could the parties have intended a sale of the stock to Hughes, when the consideration was to be paid by other parties, and the conveyance thereof, "absolutely and unconditionally," was to be made to such parties. It is true that the granting clause in the instruments is sufficiently broad to constitute a sale of the stock; but when all parts of them are taken together, and the general object and purpose of the instruments considered, they must, I think, be construed as only conferring a power upon Hughes to sell Gaston's stock to some person who would, within the time therein limited, procure him a full release and discharge from the debts and liabilities referred to.

If this view is correct, then Hughes was not such a purchaser of the stock in question as would create a liability on his part in favor of the appellants; and his failure to inform them of his relations to the stock, if in any case he would have been required to do so, was not a violation of any duty he was under to them. I am unable to discover that Hughes is chargeable with fraud, actual or constructive, in the transaction of buying up the claims, or that the appellants were defrauded thereby. In my opinion, if the appellants had a right to join in the suit as co-plaintiffs, they have not succeeded in establishing a cause of suit herein. It is claimed that this suit is in the nature of a creditor's bill, but I do not see how it can be so regarded; a creditor's bill was to reach assets, and compel an application of them to the payment of a complainant's claim. This suit is to establish a personal liability against the respondents; it is to compel them to account for property that came into their hands charged with the payment of their claims, and to establish a liability against them as purchasers of unpaid stock. In order to pursue that remedy alone, the appellants had a right to unite as plaintiffs; but when they sought relief on the grounds of the actual fraud of the respondents, they were required to show that it was a joint tort, at least we so held in the former case, and I deem it proper to make this explanation, so that the profession may not be misled by that holding.

The decree appealed from will be affirmed.