Argued 2 December ; decided 29 December, 1902.

**DEAN v. DEAN.**

[70 Pac. 1039.]

RELATIVE MENTAL CAPACITY FOR REQUIRED DEEDS AND WILLS.

1. A greater degree of mental capacity is required to make a contract or deed than to execute a will.

MENTAL CAPACITY TO EXECUTE DEED.

2. A deed by a woman of seventy-three to her son will not be set aside for mental incapacity where the evidence shows that she possessed sufficient intelligence without prompting to remember those who should have been the objects of her bounty, to comprehend the extent of her property, and to realize for an appreciable length of time that the execution of the deed to her son would prevent an equal distribution of her estate.

From Jackson: HIERO K. HANNA, Judge.

Suit by B. W. Dean and others against Ralph Dean and wife to set aside a deed, in which plaintiffs failed and appealed.

AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. William M. Colvig* and *Mr. A. Evan Reames.*

For respondents there was a brief over the names of *J. R. Neil, Charles Prim* and *Frank R. Neil,* with an oral argument by *Mr. James R. Neil.*

Mr. Chief Justice Moore delivered the opinion.

This is a suit to set aside a deed to certain real property in Jackson County, Oregon, executed February 7, 1900, to the defendant Ralph Dean, by his mother, Anna Dean, who died intestate in said county October 24th of that year, leaving as her heirs the plaintiffs and said defendant. It is alleged in the complaint, in effect, that at the time the deed was made Mrs. Dean was dangerously sick, rendering her infirm in mind, and unable to resist the undue influence of her son Ralph and his wife, the defendant Olive Dean, who, taking advantage of her incapacity, unlawfully induced her to make said deed in fraud of the rights of plaintiffs. The answer, after denying the material allegations of the complaint, avers that in February, 1882, Ralph, having attained his majority, entered into a contract with his mother, then a widow, whereby he agreed to live with, care for, and assist her in managing her property during her natural life, in consideration of which she agreed to convey the greater part of her real estate to him; and that he had faithfully kept his part of the agreement, to the satisfaction of his mother, who executed to him a deed of the premises. The reply having put in issue the allegations of new matter in the answer, a trial was had, resulting in a decree dismissing the suit, and plaintiffs appeal.

An examination of the testimony shows that Anna Dean and her husband, N. C. Dean, took up a donation land claim in said county, the north half of which was granted to him and the south half to her. Mr. Dean died intestate June 4, 1876, seized of his part of said claim and of other real property, all of which was mortgaged to secure the sum of $2,800. He left surviving him, besides his wife, his sons, Brad W., Robert H., and Ralph F. Dean, and his daughters, Sherry, now Mrs. Ro-

denberger, and Clara, now Mrs. Farra. After the death of her husband, Mrs. Dean, with the aid of her children, paid off said mortgage, and the real property belonging to his estate was, on September 25, 1899, divided among his sons and daughters by deeds of partition. Brad lived on the home place, and assisted his mother in its management until July, 1886, when he was elected sheriff, and at the close of his term of office in 1888 he returned, and was permitted by her to move an old house upon her land, in which he lived, improving a part of the premises, until his removal to Curry County in 1899. Robert lived with his mother until 1878, when, having married, he built a house on fifty-five acres purchased from her, where he remained until 1885, at which time he went to Grant's Pass, where he died February 7, 1900. The defendant Ralph went to Jacksonville, February 5, 1900, where he engaged R. S. Dunlap, a justice of the peace, and J. R. Neil, an attorney, to go the next day to his mother's, to take her affidavit to a pension voucher, and to see to the proper execution and acknowledgment of her deed conveying her real property to him. Dunlap and Neil, on account of the inclemency of the weather, did not go when they were expected, but went February 7, 1900, arriving about 2 o'clock in the afternoon, soon after a message was received announcing the death of Robert H. Dean. Neil, as defendant's witness, testifies that he found Mrs. Dean lying on the bed reading, who informed him of the sad news just received; that, having read the deed to her, she took and read it herself, saying it was all right; then arose, went to a table, signed the instrument, and acknowledged its execution to Dunlap, remarking to the latter that she had done what she had long intended to do, and that it would now be off her mind.

Much testimony was taken concerning Mrs. Dean's alleged purpose and agreement to convey her property in the manner indicated, and her mental condition at the time she made the deed, a summary of which shows that for more than eighteen years prior thereto her son Ralph lived with her, after attaining his majority, and that she told many persons she intended to convey to him her old home place; but the number of acres

which he was to receive is not disclosed, the plaintiffs contending that he was only to have the house and barn and a small tract upon which they were erected, including a spring thereon, which rendered the premises quite valuable. Ralph, however, insists that, in consideration of his care of his mother, he was to receive the land so conveyed to him. Mrs. Dean, though hard of hearing, usually enjoyed good health, possessed a strong will, delighted in asserting and maintaining her own opinions, was a successful manager of her farm, and could not be influenced by any one. At the time the deed was made she was about seventy-three years old, but, having suffered an attack of dysentery in October, 1899, which lasted about five weeks, it is maintained by plaintiff's counsel that in consequence thereof her mind was so impaired that she was not competent to enter into a contract, and that the court erred in not setting her deed aside. Mrs. Dean retained a vivid recollection of the events of her earlier life, but her memory of the things that had recently transpired was faulty, and she would repeat in a short time remarks uttered by her and questions that she had asked. In a letter written by Ralph to his brother Brad April 27, 1900, in speaking of their mother, he says: ''Ma is getting along as well as could be expected. She is quite childish, though.'' The defendant Olive Dean, Ralph's wife, at the same time wrote a letter to Brad's wife, in which she says, referring to their mother-in-law: ''Grandma is up and around all the time now. She isn't very stout, but I expect she is as well as she'll ever be. There is quite a change in her. She is just like a child, and don't get interested in anything any more. She is quite easy to care for now. Everything we do for her is just right. She doesn't get mad like she used to. I don't think she has been angry since she got sick.'' In another letter, written July 8, 1900, by her to the same person, in alluding to Mrs. Dean's mental condition, she says: ''She is awfully childish, and just worries all the time. She's very absent-minded. She don't remember anything you tell her more than five minutes. Every morning last week, when she'd get up, she'd want to know if it was Sunday.'' It will be remembered that these letters were

written after the deed was made. The testimony of several witnesses, however, shows that in the fall of 1899 Mrs. Dean's memory began to fail, and Ralph, at the suggestion of his sister, Mrs. Farra, called upon a physician who had waited upon his mother, and, having told him that it was thought her mind was affected, the doctor gave him a prescription for her general health, telling him that her mind was as sound as that of any other old person. Dr. Jones, who visited Mrs. Dean about ten times during her illness in 1889, says her mental faculties were good; stating that she was not so childish as is usual with persons of her age. He says, however, that in her last sickness, in the fall of 1900, she was very childish. Dr. Shearer visited Mrs. Dean in October, 1899, and states that he thinks she was competent to transact business. John W. Barksdell, a witness for defendant, testifies that Mrs. Dean told him in 1890 that her part of the place should go to Ralph, and that on September 10, 1900, she told witness that this son was going to have all her property, and that in answer to his remark that the matter might be deferred until it was too late she replied "I'll fool you."

It is impossible to reconcile the conflicting opinions of the witnesses called to testify concerning Mrs. Dean's mental condition on February 7, 1900, when she executed the deed to Ralph, except that there is little controversy in respect to her memory, nearly all the witnesses agreeing that she could not remember the things that were daily transpiring, and would repeat her inquiries in relation thereto at frequent intervals, but as to those events that occurred when she first settled on her donation land claim she remembered the entire particulars. As tending to show that she never meant to convey all her property in the manner in which it was disposed of, her son Brad testifies that when he returned to her place at the close of his term of office she permitted him to move an old house upon her land, agreeing to convey to him a part thereof; and, to show that Ralph made no claim to the premises which he improved, he testifies that this brother made no objection thereto. Mrs. Elizabeth Kinney (defendants' witness) testified that

when Brad was preparing to move to Curry County his mother bought the house from him, saying to her that she did not intend that any stranger should move on the place, or permit them to bother Ralph in any manner, when she was gone. Brad, as a witness in his own behalf, in rebuttal, says that he had an agreement with his mother whereby she was to pay him $225 for his improvements, but that, having paid him only $45, she agreed to convey to his two daughters ten or twelve acres each. The testimony shows that Ralph never told his brother, Brad, nor his sisters, that he had the deed in question until after his mother's death; the sisters testifying that, if they had been consulted about the conveyance, they would have interposed objections thereto. Such declarations are in the nature of cumulative testimony, for, having joined as plaintiffs in the suit to set aside the deed, it is reasonable to infer that they would have protested against its execution. It may have been that Ralph's failure to inform his brother and sisters of his having secured the deed, and of his mother's covert remark to the witness Barksdell that "I'll fool you," were designed to prevent the objections adverted to until after her death. So, too, the declaration she made in April, 1900, to plaintiffs' witness, J. C. Slagle: "Don't you think Ralph and Ollie want me to deed them my place. I would be a big fool. Ralph might die first, and Ollie could kick me out,"—may have been uttered in pursuance of her plan to avoid, during her life, any controversy with her children about the deed she executed to her son as a reward for his faithful service. Ralph, as a witness in his own behalf, testifies that in February, 1882 his mother told him that if he would remain with her, and care for her place, she would deed to him the property before she died; and that he accepted the offer, and faithfully kept his part of the agreement; and that on February 7, 1900, she, in consideration thereof, executed the deed to him. He also says that about two weeks prior thereto his mother told him she desired him to have the land, and requested him to see that the deed was all right, and that in pursuance thereof he employed Neil to prepare it. He is corroborated by the testimony of his wife in

relation to Mrs. Dean having requested him to have the deed prepared, and that she would execute it. As tending to show that Mrs. Dean was not conscious of the execution of the deed, her daughter Mrs. Farra testifies that in August, 1900, and once thereafter, her mother desired her to write to her brother Brad requesting him to come and fix up her business, and that the witness, not knowing that the deed had been made, promised to comply with her mother's wishes. The testimony shows that Mrs. Dean did not convey all her real property to Ralph, and that she died possessed of certain personal property, including the sum of $400 in money, which was divided among her children, so that her request to have her son Brad arrange her business, if it could be construed as evidence of a purpose to make a will, shows that, notwithstanding the execution of the deed, she possessed property upon which her testament, if executed, could have operated.

We believe the foregoing is a fair statement of the testimony, which has been examined with much care, and the question to be determined from its consideration is whether Anna Dean, at the time she executed the conveyance to her son, possessed sufficient intelligence to understand fully the nature and effect of the transaction. It clearly appears that she was at all times able to converse rationally upon all subjects, and though, in consequence of her defective hearing, it was difficult for strangers to make her understand all that was said, she was a great reader, and took delight in perusing the newspapers. She was a pioneer of Southern Oregon, and retained to the last a vivid recollection of the hardships that the early settlers of this state endured, and cherished the friendship that common privation and danger seemed to enkindle in the minds of these sturdy people. She could not remember, however, the events that transpired in the last year of her life; her failure in this respect becoming noticeable just before her illness in October, 1899. A defect of memory is probably the first evidence of an impairment of the mental faculties. Impressions made upon the mind are deep and lasting or shallow and transitory, just in proportion to the degree of attention which a

person gives to the facts perceived or to the truths conceived. To direct the attention in a particular channel, or to keep it concentrated for a reasonable time upon a given subject, requires an exercise of the will, which makes impressions upon the mind that are reproduced by the association of ideas; and, as the inability to recall these sensations and reflections evidences a want of power, so the condition of the memory is usually the index of the mental status of every person. No human faculty is probably so susceptible to development as the memory, but to attain distinction in this direction requires constant practice, which presupposes an exercise of will power. It has been observed by those who have given the subject careful consideration that the person who cannot write usually retains a better knowledge of the details of a business transaction than one who commits the general outlines thereof to paper, and this is so because the former must necessarily rely upon his memory, while the latter depends upon his memoranda. A failure of the memory to recall perceptions and conceptions, resulting either from age, debility, or injury, evidences an impairment of the receptive properties of the mind, after which the degree of memory remaining is the criterion of mental capacity. This being so, the question recurs whether Mrs. Dean, on February 7, 1900, possessed sufficient intelligence to enable her to enter into a valid contract. "The failure of memory," says Mr. Justice TRUNKEY in *Wilson* v. *Mitchell*, 101 Pa. 495, "is not sufficient to create an incapacity, unless it be total, or extend to his immediate family or property. The want of recollection of names is one of the earliest symptoms of the decay of the memory; but this failure may exist to a very great degree, and yet 'the solid power of understanding' remain."

In *Carnagie* v. *Diven*, 31 Or. 366 (49 Pac. 891), a grantor of real property, eighty-three years old, having died the next day after executing the deed thereof, his heirs instituted a suit to set aside the conveyance, alleging in the complaint "that prior to the time of his death and immediately before said time" he was feeble in body and mind, occasioned by his extreme age, and unable intelligently to enter into a contract, or to perform

any business. A demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of suit having been sustained, and the suit dismissed, the plaintiffs appealed, and in affirming the decree it was said: "Capacity to convey real property must be equivalent to ability to devise the same, in which case the state of the testator's mind is determined by its condition at the time the instrument was executed." The language thus quoted was used by way of argument to show that it was essential to aver in the complaint the condition of the grantor's mind at the time he executed the deed, and allege at least a state of mental weakness which negatived every inference of capacity to make a testamentary disposition of his property.

1. It is a well-settled rule, upheld by numerous adjudications, that it requires a greater degree of mental capacity to make a contract than it does to execute a will: 1 Underhill, Wills, § 89; *Kerr* v. *Lunsford,* 31 W. Va. 659 (8 S. E. 493, 2 L. R. A. 668); *Harrison* v. *Rowan,* 3 Wash. C. C. 580 (Fed. Cas. No. 6141).

2. In *Delafield* v. *Parish,* 25 N. Y. 9, the court, in discussing testamentary discernment and efficient recollection, say: "We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been, the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will." We think that, notwithstanding Mrs. Dean's memory of recent events was faulty, the preponderance of the testimony conclusively shows that she possessed

sufficient intelligence, without prompting, to remember those who should have been the objects of her bounty, to comprehend the extent and character of her property, and to realize for a sufficient length of time that the execution of the deed to her son would necessarily deprive her other children of an equal distribution of her estate, and, in our opinion, she possessed what is denominated an "active memory," rendering her competent to enter into a contract. Though Ralph lived with and cared for his mother, who was well advanced in years, no evidence was offered tending to show that he in any manner tried to prevent her from seeing or conversing with her other children; and, while he did not divulge to them the fact that he had secured her deed, such secrecy and the amicable relations existing between him and her may have been circumstances from which his domination over her might be inferred. Such conditions, however, do not conclusively establish the exercise of undue influence: 1 Underhill, Wills, § 131. Every inference of that character is dispelled by what we deem to be the weight of testimony, which shows that Mrs. Dean executed the deed to her son in consideration of his many years of faithful and loving care of her, and in pursuance of her indomitable will to effectuate her agreement with him, and in conformity with her previously expressed opinion to reward him for such service. There being no evidence of undue influence, it follows that the decree is affirmed.     AFFIRMED.

Decided 29 December, 1902.