Argued 4 October, decided 30 October, 1906.

## HAMILTON v. HOLMES.

87 Pac. 154.

DEED—MENTAL CAPACITY OF GRANTOR.

1. The evidence here does not show such a state of the grantor's mind as to render her incompetent to execute the deed in question, though she was much depressed by the death of her children and her domestic disagreements, and was hysterical and incoherent at times. This conclusion is partly influenced by the fact that competent medical witnesses who attended her about the time in question were not called.

RELATION BETWEEN ATTORNEY AND CLIENT—CONTRACTS FOR FEES.

2. The relation between an attorney and a client is one requiring the utmost fairness by the attorney and contracts between them advantageous to the former will be closely scrutinized; yet care must be exercised to avoid injustice, for clients are often anxious to secure the services of capable attorneys of reputation and tact, and willingly contract for fees that seem very high in comparison with the charges made by attorneys of less reputation.

ATTORNEY AND CLIENT—INADEQUATE CONSIDERATION.

3. The testimony in this case does not show such a wide difference between the value of the property conveyed and the value of the services performed as to shock the conscience of a chancellor and render the transaction constructively fraudulent.

EVIDENCE CONSIDERED AS TO INTENT—DEED OR MORTGAGE.

4. The evidence submitted in this case does not show that the grantor meant to give a mortgage rather than a deed.

TRUSTEE—EQUITABLE CONTROL—MONEY HAD AND RECEIVED.

5. One holding the legal title to land under a promise to sell and make a given disposition of the proceeds is subject to two alternatives; he can be compelled to sell if he refuses to do so upon the offering of a reasonable price, or, if he sells, the parties entitled to the proceeds may sue for their proportions as for money had to their use.

From Benton: JAMES M. HAMILTON, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by James E. Hamilton, as sole heir of his mother, Anna Hamilton, deceased, against Webster Holmes and W. H. Holmes to have an absolute deed executed by her to Webster Holmes declared to be a mortgage and for an accounting. The facts are that the defendants, who are attorneys, were employed by Mrs. Hamilton to institute a suit for her against her husband, John Hamilton, for a dissolution of the marriage contract and for a settlement of property rights; and, as she had no money to pay therefor, she agreed to give them, as compensation for the service to be performed, an undivided one-half of all that part of a donation land claim in Benton County which they should secure from her husband. The defendants,

negotiating with Hamilton, obtained by his direction from one Frank Wilkinson, who held the legal title, conveyances to Mrs. Hamilton of an undivided one-half of the north half of such land claim, all interest in the south half thereof, and two lots in Junction City, which deeds were placed in escrow, to be delivered when the divorce was granted. The property rights having been thus amicably adjusted, Mrs. Hamilton, on December 24, 1900, entered into a written contract with the defendants, in which it was stipulated that she would convey to Webster Holmes all her interest in the donation land claim, which he was to sell as soon as practicable and to the best advantage possible, and pay her in cash one-half the proceeds of such sale, retaining the remainder for himself and his codefendant as their compensation. The suit for divorce on the ground of desertion, in which the defendant made no appearance, was tried, and Mrs. Hamilton secured the decree January 29, 1901, on which day, for the expressed consideration of $500, she executed a deed to "Webster Holmes as trustee," as agreed upon, which deed was duly recorded. Mrs. Hamilton soon thereafter went to Denver, Colo., where she died March 3, 1901, leaving the plaintiff herein her sole heir. The defendant Webster Holmes on August 29, 1901, borrowed from one M. D. Allen the sum of $700, and to secure the payment thereof gave him a mortgage of all the interest in the donation land claim that had been so conveyed to him.

The plaintiff attained his majority June 20, 1903, and thereafter instituted this suit, alleging that the land conveyed by his mother to Webster Holmes was of the value of $2,000; that she agreed with the defendants to pay them a reasonable sum for their services, to secure the payment of which she executed such deed, and at the time it was made she was inexperienced in the transaction of business, easily influenced by others, ignorant of the value of such land, and, acting solely on the solicitation of the defendants, and without independent advice, she executed the deed, which was intended as a mortgage to secure the payment of a reasonable sum as attorneys' fees, which is $250; that the plaintiff requested Webster Holmes to state what sum, if any, was due the defendants as their compensation, and de-

manded of him the execution of a deed to the premises to himself as the sole heir of his mother, but he refused to comply threwith; and that the plaintiff was willing that the defendants should be paid a reasonable attorneys' fee, and offered to pay the same upon the execution of a conveyance to him of such premises free of all incumbrances placed thereon by Webster Holmes. The prayer of the bill is that the defendants be directed to account for the sum of $700 and interest thereon, as evidenced by the mortgage, less a reasonable compensation as attorneys' fees, and that Webster Holmes be required to convey the premises by good and sufficient deed, clear of all incumbrances, to the plaintiff, and for general relief. The answer denied the material allegations of the complaint, averred the facts, in substance, as hereinbefore stated, and that the defendants agreed with Mrs. Hamilton that Webster Holmes should take and hold the title to such lands in his own name for himself and as trustee for his codefendant, and for no other person, to sell the premises according to the terms of their contract, and that she intended to and did convey all her right, title and interest in the premises without any reservation to herself therein, and that Webster Holmes never at any time held any part of the land in trust for Mrs. Hamilton or for her son, the plaintiff herein. The reply having put in issue the allegations of new matter in the answer, the cause was tried, resulting in a decree as prayed for in the complaint, and the defendants appeal.      REVERSED.

For appellants there was a brief over the names of *W. H.* and *Webster Holmes, in pro per.,* and *Henry Johnson Bigger,* with oral arguments by *Mr. Webster Holmes* and *Mr. Bigger.*

For respondent there was a brief and an oral argument by *Mr. John Bayne.*

MR. JUSTICE MOORE delivered the opinion of the court.

The defendants, as witneses in their own behalf, testified that when retained by Mrs. Hamilton she represented to them that her father had been the owner of the north half of a donation land claim in Benton County, containing in all 319.85 acres, and that she had been the owner of an undivided one-third of

the south half thereof, the other interests therein being owned by two sisters; that her father moved to California, where he became ill, and she with her family went to that state to care for him, and while there her husband, without any consideration therefor, induced her father to execute to him a deed of his part of such claim, and also two lots in Junction City, which he also owned; that her husband persuaded her to join in executing to one Frank Wilkinson a deed of such real property, including her interest in the south half of such claim, but that the conveyance was made to defraud her out of her property rights, and after her father's death her husband deserted her; that she was compelled to return to Oregon, making the journey with a team, and on the way her three daughters contracted colds from exposure incident to the trip, and died of consumption; that, coming to Salem, Mrs. Hamilton secured employment, whereby she was enabled to support herself and her remaining child, the plaintiff herein, but she felt indignant at the treatment she had received from her husband, and blamed him for the loss of their children, whose death caused her much grief; that the plaintiff's mother did not regard the donation land claim as being worth much, because the buildings thereon were dilapidated and the fences decayed and fallen, so that no profit was derived from the premises, but she considered the lots in Junction City valuable, inasmuch as they had houses thereon that could be rented from which a revenue was derived; that, not knowing the value of the real property in Benton County, except in a general way, they made the agreement with Mrs. Hamilton as hereinbefore stated, and performed the service specified, receiving as their compensation her deed in full settlement thereof, they stipulating to sell the real property so conveyed, and to pay her one-half the sum realized therefrom, but that they had been unable to secure a purchaser therefor; that their attorney's fee for securing the divorce and for adjusting the property rights was fully paid and discharged by the execution of the deed, which was never intended as a mortgage, but was designed as an absolute conveyance of the premises to be held in trust by Webster Holmes for his codefendant, and for no other person; that

at the time Mrs. Hamilton employed them and also when she
executed such deed she was competent and qualified to make a
valid contract, and, though she mourned the loss of her daugh-
ters, her grief was no more than that of other mothers under
like affliction; and that they were negotiating with plaintiff's
father about two months before they secured a settlement of the
property rights of the parties to the divorce proceedings. Mrs.
Pugh, a sister of the plaintiff's father, testified that in the fall
of 1900 Mrs. Hamilton was very nervous and under a mental
strain all the time, and that she would occasionally laugh and
talk to herself, while at other times she would cry and wring
her hands. The plaintiff, speaking of his mother's mental con-
dition at that time, testified that she would become excited and
flustrated about things that did not amount to anything, and
that she was very nervous.

It will be remembered that Mrs. Hamilton secured a deed for
the undivided half of the north half of the donation land claim
in Benton County and the undivided one-third of the south half
thereof, her interest therein being equivalent to 133.26 acres.
The testimony of several witnesses who are acquainted with this
land is that at the time it was conveyed to Webster Holmes it
was worth $15 an acre, or $1,998.90. The court, however, found
it to be of the value of $2,000. An attorney who appeared as
plaintiff's witness testified that the service performed by the
defendants in maintaining the suit for a divorce and procuring
a decree therein, no defense having been interposed, and in
securing out of court a settlement of the property rights of the
parties, was reasonably worth from $100 to $125. It is argued
by plaintiff's counsel: (1) That though the complaint admits
that such service was worth $250, the reasonable value thereof,
as disclosed by the testimony, is so small when compared with
the worth of the real property pretended to have been conveyed
to Webster Holmes in payment thereof as to afford conclusive
evidence of such gross inadequacy as to render the transaction
constructively fraudulent; (2) that the relation of attorney and
client, existing between the defendants and Anna Hamilton
when her deed was made to one of them, precludes the accept-

ance of the conveyance, except by way of security; (3) that her ignorance of the value of the land conveyed and her inexperience in relation to transacting business show that she could not distinguish between a deed and a mortgage; and (4) that her mental condition was such that at the time the deed was executed she was easily influenced, which defect, considered in connection with the other circumstances mentioned, raised an inference of unfair dealing, which precludes the defendants from claiming the advantage which they secured, and for these reasons the decree should be affirmed.

1. We will first consider the condition of Mrs. Hamilton's mind when she executed the deed to Webster Holmes, for if at that time her intellect was impaired, such defect, coupled with the other matters adverted to, may be sufficient to avoid her deed, or at least tend to show that it should only stand as security for the payment of a reasonable attorney's fee. No physician was called by plaintiff's counsel to express an opinion concerning Mrs. Hamilton's mental condition, though the testimony shows that in the summer of 1900 she was ill, and received treatment therefor from a doctor. That no medical expert was called to testify on this branch of the case, when one could undoubtedly have been procured, is a circumstance strongly tending to discredit the claim that Mrs. Hamilton was afflicted with mental weakness. That she talked to herself does not necessarily prove intellectual impairment. "The giving of vocal expresison to human thought is natural, and observation teaches that persons who live or work alone often talk to themselves. Man was created a social being, and therefore needs companionship, a deprivation of which might induce insanity; but this generally results in such cases from a failure to exercise the reasoning faculties, whereby the mind becomes like a stagnant pond, foul from inactivity, or proceeds from the practice of filthy habits, which solitude seems to cultivate. Excessive grief is generally classed as a moral cause of insanity, which saps the foundation of the mind with tears, and seemingly compels the person distressed therewith to avoid laughter as a source of evil:" Browne, Med. Juris. § 49. The death of Mrs. Hamilton's daughters

caused her to grieve, but the laughter which she occasionally enjoyed shows that the sorrow produced by the loss of her children was not excessive, and only such as a loving mother must necessarily have endured. She evidently possessed a mind capable of understanding and appreciating the nature and effect of her business transactions, and she was therefore competent to consummate a valid contract: *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891); *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Dean* v. *Dean,* 42 Or. 290 (70 Pac. 1039).

2. The relation that existed between the defendants and Mrs. Hamilton, and the compensation which they claim to have received from her for the service which they performed, will next be considered. The relation existing between an attorney and client being confidential and fiduciary, the client must necessarily rely on the attorney in all matters intrusted to him, which dependency places on the latter the duty of exercising the highest degree of fairness in their dealings with each other, which are not regarded as having been consummated at "arms length"; and when their contracts are challenged by the client as unequal, they will be closely scrutinized by the court, and the burden is cast on the attorney to prove that any advantage which he may have secured to himself was not obtained by undue influence: Weeks, Attorneys (2 ed.), § 258; 3 Am. & Eng. Enc. Law (2 ed.), 332; 4 Cyc. 960; *Powell* v. *Willamette Valley Ry. Co.* 15 Or. 393 (15 Pac. 663). A court of equity, when properly appealed to by a client who claims to have been defrauded by his attorney, will not permit the latter to reap the benefit of a hard bargain, or allow him to take an undue advantage of his client in his dealings with him: *Ah Foe* v. *Bennett,* 35 Or. 231 (58 Pac. 508). As the compensation of an attorney is regulated by the terms of an expressed or implied contract with the client (B. & C. Comp. § 560), a contract entered into between them in relation thereto will be upheld when it appears to be fair and honest: *Bingham* v. *Salene,* 15 Or. 208 (14 Pac. 523, 3 Am. St. Rep. 152). The compensation which an attorney merits and that which he can command for the performance of professional services depends upon the measure of his knowledge of

the law, the extent of his previous practice, and whether or not he had been successful in the trial or settlement of causes, and the degree of his standing at the bar. Attorneys possessing these necessary qualifications are sought after and employed by clients who are able to pay them fees for their service that are commensurate with their education, integrity, ability and tact, while attorneys who have not established for themselves such a reputation generally fail to secure a lucrative practice. As the intellectual labor of an attorney is not like the manual work of an artisan, which can generally be as well performed by one skilled mechanic as another, no schedule of fees can well be adopted that will be just to the successful attorney who has had much experience. If the compensation paid to an attorney is to be measured in every instance by what is considered even to be a reasonable fee, few contracts entered into between an attorney and a client in relation thereto would be upheld, for attorneys may be found who would be willing and anxious to undertake the performance of the service rendered at a much reduced fee.

3. Applying these principles to the case at bar in treating of Mrs. Hamilton's property rights, as she had been the owner of an undivided one-third of the south half of the donation land claim, the defendants might have been able in the divorce suit, in a contest therefor, to have secured such estate for her if they could have established the fact that she had been deprived thereof by her husband with intent to defraud her, and that Wilkinson was his trustee. As none of the other real property had ever been owned by her, but had been conveyed by her father to her husband, the defendants, by making the proof indicated in the divorce suit, could have secured only an undivided one-third of the land: B. & C. Comp. § 511. Mrs. Hamilton was unquestionably entitled to a decree of divorce, as the defendants must have known; but the probability of her securing any interest in the land in the condition in which the title was held was remote. In this state of the case the defendants undertook to try her cause on a conditional fee, and by the settlement out of court, which required about two months' negotiation, they

secured for her an absolute title to the lots in Junction City, an undivided one-half of the north half and all interest in the south half of the donation land claim—a much greater estate than they could possibly have obtained if her property rights had been contested in court.  As uncertainty is an element that enters into every contract for the payment of a conditional compensation for the performance of professional service, a contingent fee, in case of the successful termination of a suit or action, it is expected to be greater than where the payment is fixed and certain in any event.  This being so, if Mrs. Hamilton had stipulated to give the defendants one-half of the entire real property which they could secure for her, the compensation would not have been unreasonable, in view of the condition of the title, for a moiety in such cases is often the measure agreed upon.  The Junction City lots, however, were excepted from the terms of the contract.

What has here been said in relation to the compensation agreed upon will also apply to the alleged ignorance of Mrs. Hamilton as to the value of the land which she stipulated to give the defendants.  In the neglected condition of the property she did not consider it as of much value.  The defendants were unacquainted with the premises, but as the compensation which they were to receive was contingent, the value of the land is not so important, for the more they secured for her the more they would obtain for themselves.  There is not, therefore, such a difference between the value of the services rendered and the worth of the property received as to render the transaction fraudulent, or to show that the defendants exercised any undue influence over their client, or violated in the smallest degree their professional duty.

4. This brings us to a consideration of the remaining question, whether or not Mrs. Hamilton's ignorance in relation to the transaction of business shows that she intended to give the defendants a mortgage, and not to execute to them a deed. There is not a word of testimony in the transcript tending in any manner to prove that she did not intend to execute an absolute deed, and we are satisfied that it was her design to give, and

the defendants' purpose to accept, a conveyance of an undivided one-half of the real property which they could secure for her. Eliminating from the case the circumstances hereinbefore adverted to as tending to show fraud or undue influence, there is not a particle of evidence upon which a decree could be based converting the deed into a mortgage. The defendant Webster Holmes by a subsequent agreement took an absolute title in fee to the premises, in trust, however, to sell the same, and pay one-half the sum so realized to Mrs. Hamilton's legal representative, retaining the remainder for himself and his codefendant; and though he mortgaged the entire premises to secure the payment of $700 and interest, one-half the value of the land is probably sufficient to pay the entire debt.

5. If he refuses to sell the property when a reasonable sum is offered therefor, a court of equity will compel him to execute the trust, and if he sells without such compulsion, an action at law can be maintained against him to recover one-half the sum obtained as money had and received: *Duclos* v. *Walton,* 21 Or. 323 (28 Pac. 1).

The plaintiff, however, is not entitled to the relief sought herein and hence the decree is reversed, and the suit dismissed.

REVERSED.