Argued 9 October, decided 22 October, 1907.

### REEDER v. REEDER.

91 Pac. 1075.

DEED—CAPACITY OF GRANTOR.
1. A person otherwise competent who understands and appreciates the nature and effect of a proposed transaction is competent to execute a deed.

DEED—EVIDENCE OF CAPACITY OF GRANTOR.
2. The evidence satisfactorily establishes that the grantor in the deed under consideration understood what she was about to do and intelligently accomplished a plan formed at some previous time.

DEED—SUFFICIENCY OF DELIVERY—DEATH OF GRANTOR.
3. A deed is delivered if it is given into the possession of a third person, without any power to recall it or change its disposal, with instructions to deliver it to a specified person after the grantor's death.

From Multnomah: JOHN B. CLELAND, Judge.

Suit to set aside a deed, resulting in a decree for defendant, from which this appeal is taken.                    AFFIRMED.

For appellants there was a brief over the names of *Edward & A. R. Mendenhall,* with oral arguments by *Mr. Alfred Rush Mendenhall* and *Mr. Thomas Griffin Hailey.*

For respondent there was a brief over the names of *S. H. Haines* and *Snow & McCamant,* with an oral argument by *Mr. Wallace McCamant.*

Opinion by MR. CHIEF JUSTICE BEAN.

This is a suit brought by F. B. Reeder and six other heirs of Catherine Reeder, deceased, to cancel and annul a deed from

the latter to her son, J. L. Reeder, for 140 acres of land in Multnomah County. About 1855 Catherine Reeder and her husband, S. M. Reeder, settled upon a donation claim of 320 acres on Sauvie's Island, and afterwards completed the required residence and cultivation, and received a patent, in which the south half of the claim was designated as inuring to the husband, and the north half to the wife. Mrs. Reeder and her husband continued to reside upon the claim until their death, rearing a large family, of which defendant is the eldest. About 1878 defendant married, and built a dwelling house on the north half of the claim, about a quarter of a mile from the family residence, in which he continued to live until 1894, when his house was destroyed by a flood. He thereupon built another dwelling, with the consent of his parents, and, as he testified, under a promise by them that, if he would continue to reside on and cultivate the place and look after them during their lifetime, the land should belong to him. He has ever since resided upon and cultivated the land in connection with his father and other members of the family. S. M. Reeder died in 1902, and his wife, Catherine Reeder, continued to live in the family home, with her son F. B. Reeder and her two daughters, Mrs. Godwin and Mrs. Akin, until her death on November 22, 1905. Mrs. Reeder was about 75 years of age at the time of her death, and for some years prior had been in feeble health, but was not confined to her room, except for perhaps a month before her death. About two weeks before she died she executed a deed, conveying her half of the donation claim, except the family home and 20 acres of land surrounding it, to defendant, in consideration of love and affection, and made a will disposing of the remainder of her property. The deed was in the possession of a third person until after her death, when it was delivered to defendant and by him put on record; whereupon this suit was brought by the other heirs to set aside the deed, on the ground that the grantor was mentally incapable of making a valid conveyance.

There is much testimony in the record, principally from in-

terested parties, concerning the mental condition of Mrs. Reeder at the time, prior, and subsequent to the making of the deed, and many witnesses testified that, in their opinion, she was so feeble in mind and body as to be unable to intelligently and understandingly dispose of her property. Others expressed the opinion that her mental faculties were as good as ordinarily possessed by persons of her age, and that she was perfectly competent to transact any ordinary business.

1. It is unnecessary to refer to the opinion evidence in detail. The uncontradicted testimony of S. H. Haines, who prepared the deed and before whom it was executed, shows beyond reasonable controversy that it was the act and deed of Mrs. Reeder, and that she fully understood and comprehended the nature and effect of the transaction. And this is sufficient to sustain the instrument as a valid conveyance: *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891); *Dean* v. *Dean,* 42 Or. 290 (70 Pac. 1039).

2. The defendant, J. L. Reeder, testified that, while on his way to his work, he stopped to see his mother on the morning of the 7th of November, and found her in good spirits. She claimed to be improving, and said she expected to be out in a day or two. She inquired when he would go to Portland, and he told her as soon as he finished digging potatoes, which would be about 11 o'clock of that day, and she requested him to secure the services of some person to make out some papers for her, the nature and character of which she did not indicate to him. He went to Portland that afternoon, and engaged S. H. Haines, an attorney of this court, to make out such papers as his mother might desire to execute. He and Haines went by boat that afternoon, and the next morning he took Haines over to his mother's house, and introduced him to her, and left them together in the room where the papers were prepared. He was not present at the time and did not know the contents of the papers until after his mother's death. Haines testified that the defendant came to his office in Portland on the 7th of November, and told him that his mother wanted to make out some

papers, relative to the final disposition of her property, and inquired if he could go down and attend to the matter for her, and he agreed to do so; that defendant was unable to tell him what character of papers his mother desired to execute, whether a will or deeds, and he, witness, inquired the number of children, and, being told by defendant, took with him a blank will and nine warranty deeds. He reached the Reeder place about 4:30 o'clock in the afternoon, and he remained over night with defendant, and the next morning went with him to Mrs. Reeder's residence. He had never seen Mrs. Reeder and was not acquainted with any of her children, except defendant. When they went into Mrs. Reeder's room, she was lying in the bed, and defendant spoke to her, inquiring after her health, and then introduced witness to her, and told her he had come to prepare such papers and transact such business for her as she might wish or desire, and then left the room. What afterwards transpired is thus detailed by Haines:

"I moved my chair up a little closer to the old lady, as I noticed that she was inclined to be a little deaf, and I asked her what I could do for her. She says: 'I want to draw up some papers that should have been (I think she used the words "should have been") fixed up long ago.' And she says: 'I have waited as long as I am going to, and I want now to straighten out my property.' I asked her whether she wanted to convey her property by will or by deed, and she says: 'I want to make a deed to J. L. Reeder for his home, and will make a will for the balance of the property.' I then took and drew up, I am not certain whether I drew the will up or the deed up first, but my impression is I drew the will up first; and she told me that she wanted to leave the property equally to each of the heirs, excepting J. L. Reeder, who had received his portion by deed. That he was not to share in any of the other property. I drew the will exactly in accordance with her direction. After drawing up the will, I then took a deed and filled in the forepart of the deed or commencement of the deed until I got to the description of the property. Then I asked her if she could give me the description of the property she wanted to deed to J. L. Reeder, and she says: 'I want to give J. L. Reeder the north half of the original donation land claim.' I think she said S. M. and Catherine Reeder, that I cannot say,

and I wrote the deed in accordance with her description, and she designated the north line thereof to be the north side of a road running east and west across the place and over the slough as being the north boundary line to the property she wanted conveyed to J. L. Reeder. She stated at that time that she wanted the bridge that goes over the slough to be on J. L. Reeder's portion, as he would never block the bridge so that the others could not pass, while she was afraid that the others would prevent him from crossing over, and for that reason she also made the north side of the road the boundary line to J. L. Reeder's portion, so she stated. I wrote the description in the deed just as she dictated it, and she afterwards signed, executed and acknowledged it before me.

Mrs. Reeder's mind at the time was exceptionally good, and she perfectly understood what she was about. In talking over the conveyance she said the reason why she wanted J. L. to have this property was that he had always stayed at home and has spent a good deal of money on the property, in fixing it up, has 'always assisted Pa and I, and always looked after us, and seen that we were properly cared for, and is the only one that has ever taken an interest in the place; that when his house was washed down we told him to build where his present house stands, and that would be his portion of the estate, and that this conveyance is in accordance with the agreement which Pa and I had often talked and agreed upon.' After the papers were prepared and I read the will twice aloud to Mrs. Reeder so she understood each and every word, and I also read the deed to her carefully and slowly and she understood it. When I got through, I said: 'Now, Mrs. Reeder, if there are any changes you want to make, now is the time to make them, and if it is not correct, now is the time to correct them.' And she said they were just as she wanted them. I was very careful in reading the papers to her. She was old and hard of hearing, but not quite as hard of hearing as has been pictured, or did not seem so to me. I sat quite close to her and talked no louder than I am talking now, and she understood each and every word. I had to repeat but very little to her.

After the papers were drawn up I said: 'Mrs. Reeder, we have to have a witness. Is there any one around here you know of that can witness the will and deed?' She said there is a Mr. Bonser here, but that some of her family had married into that family or there was a relation there that she did not care to have mixed up in the deed, as that would tell the contents, and she did not want them to know the contents of her papers.

She said: 'Mr. Banks lives right down here, and I think he will witness it'—would I go down and try him? I told her I would, and I looked at my watch, and it was then about 12 o'clock. I had been with her from 9 or 9:30, in that neighborhood. I told her it was now lunch time and I would go up to J. L.'s and eat lunch, and would then go and get Mr. Banks, and would come back and she could then sign the papers, and she said very well. I put the papers in my pocket, and went up and got my lunch, and afterwards Mr. Hayes, a son-in-law of Mr. Reeder's, and I, went down to Mr. Banks' place, and got him to come up and witness the deed. When we reached Mrs. Reeder's house, Mr. Banks and I walked up on the porch, and I took hold of the knob and found the door locked. I rang the bell and some one unlocked the door, and pulled it open probably two or three inches, and went into another room. I don't know, I never saw, who unlocked the door. And we walked into the room where Mrs. Reeder was. She thereupon executed the will and deed, and Mr. Banks and myself signed as witnesses. After the papers were executed, she talked to us a few minutes, and then we went away. I put the papers in my pocket, and Mr. Banks and I walked up to the orchard of J. L. Reeder, where Mr. Reeder and a force of men were pulling beets in the orchard, and I told Mr. Reeder I had a deed for him, but it was not to be recorded until after his mother's death, and he said: 'You take and keep it then until such time as it is necessary to put on record.' I did not show the deed to him, or show him its contents, unless it was to tell him that it was for his home place."

This testimony of Haines is absolutely undisputed, and the witness stands wholly unimpeached, and there is therefore no reason why full credence should not be given to his evidence. It shows that the deed was the voluntary act of Mrs. Reeder, and that she fully comprehended the nature of the transaction in which she was engaged. Under these circumstances and upon such a record the court would not be justified in disturbing her disposition of her property on account of old age, sickness or debility of body.

Some suggestion was made at the argument that the deed was the result of undue influence and fraud. It is doubtful whether the averments of the complaint are sufficient to raise

these questions; but, however that may be, there is no testimony whatever to support them.

3. The point was also made in the brief, though not much relied on at the argument, that there was no such delivery of deed as would pass title. The testimony shows that the deed was delivered by Mrs. Reeder to Haines to be held by him until her death, and then delivered to defendant. All control of the deed passed from her at the time it was delivered to Haines. She thereafter had no right to recall it, and this is a sufficient delivery within the law: *Hoffmire* v. *Martin,* 29 Or. 240 (45 Pac. 754).

Without further reference to the testimony, it is sufficient to say that from a careful examination of the entire record we are satisfied that the findings of the trial court should not be disturbed, and the decree is therefore affirmed.      AFFIRMED.

---

Decided 30 July, 1907.