Argued March 10, decided May 18, rehearing denied July 20, 1909.

## AMES *v.* MOORE.

[101 Pac. 769.]

DEEDS—MENTAL CAPACITY—EVIDENCE.

1. Evidence, in a suit to set aside a deed, *held* to show that, though the grantor was old, with the natural enfeeblement of physical and mental powers, she retained an unimpaired judgment and an active memory rendering her competent to make a valid contract.

DEEDS—VALIDITY—UNDERSTANDING OF GRANTOR.

2. Evidence, in a suit to set aside a deed, *held* to show that the grantor understood the nature and effect of her act and intended to execute an absolute deed.

DEEDS—VALIDITY—MISTAKE.

3. There having been no mutual mistake in the execution of a deed and a contract by the grantee to take care of the grantor in consideration of the

deed, the grantee's belief that the legal effect of the instruments was to give him only a lease for the life of the grantor is no ground for setting aside the deed or limiting it to such effect.

DEEDS—CONSIDERATION.

4. The contract of a son to take care of his mother for life for a conveyance of land is sufficient consideration for the deed.

DEEDS—CONSIDERATION—PERFORMANCE.

5. The consideration of a deed from mother to son of her farm, his contract to immediately commence settling his business where he was living, and as soon as convenient to move to the farm and cultivate it, to maintain for her exclusive use, commencing the following July, a room on the premises, and to furnish her support, was fully performed, though the grantor died two days after the grantee's arrival and before the time for maintenance of the room.

DEEDS—DELIVERY.

6. Delivery to the grantee of a deed, the consideration of which is his contract to take care of the grantor for life, passes the title.

DEEDS—VALIDITY—FRAUDS AND MISREPRESENTATIONS—EVIDENCE.

7. Evidence, in a suit to set aside a deed, *held* to show no fraud or undue influence practiced by the grantee on the grantor.

From Douglas: JAMES W. HAMILTON, Judge.

Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by Sarah S. Ames and others against Shelton D. Moore, to set aside a deed to real property. Sarah A. Moore, the mother of the defendant, being the owner of a farm in Douglas County, executed to him a warranty deed thereof, in consideration of $1 and of his written agreement to abide by the following conditions: That he would immediately commence settling his business in Josephine County, and as soon as convenient would move to the farm and cultivate it; that beginning with July 1, 1906, he would maintain for her exclusive use a convenient room or other domicile on the premises; that he would furnish her clothing, support, and medical care, in accordance with her station in life, during her remaining years; and that at her death he would defray the expenses of her last sickness and of her funeral. Mrs. Moore died November 2, 1905, aged eighty-one years, eleven months, and twenty-three days. Her last will having been admitted to probate, her daughters, the plaintiffs, Sarah S. Ames and Mary Wolcott, who, with the defendant, were designated as her residuary legatees,

instituted this suit, making H. L. Gilkey, the administrator with the will annexed, a party plaintiff.

The gist of the action is the alleged mental incapacity of Mrs. Moore at the time the deed was given. The cause being at issue was referred, and from the testimony taken the court made findings of fact, and, based thereon, set aside the deed. From this decree the defendant appeals.                               REVERSED: DISMISSED.

For appellant there was a brief and an oral argument by *Mr. H. D. Norton.*

For respondent there was a brief over the names of *Messrs. Fullerton & Orcutt,* with an oral argument by *Mr. Albert N. Orcutt.*

Opinion by MR. CHIEF JUSTICE MOORE.

1. In order to determine whether or not Mrs. Moore was competent to execute a valid contract on August 29, 1905, we shall examine the state of her health and her mental condition prior and subsequent to the signing of the deed. In November, 1902, she had an attack of pneumonia, which seemed to render her peevish and to impair her memory somewhat. During the cold weather she occasionally had neuralgia, and when suffering therefrom appeared to be almost distracted. The last year of her life she would mutter and talk aloud when no one was near. She did not converse with her sons or daughters about her business. She safely guarded her property interests, and at her death possessed $10,366 in money, most of which was deposited with a bank. She remembered a granddaughter, who visited her in September, 1905, and though she had not seen this relative for 20 years, yet she had a clear recollection and talked about the circumstances of this granddaughter's early life. She seemed to forget, however, the little incidents which occurred on the preceding day. Thus she ordered a load of wood, and when it arrived admitted that she

did not remember requesting it. At another time she asked to be taken to town, and the next day denied that she had so solicited.

Witnesses called by the defendant testified that, considering her age, Mrs. Moore was remarkably intelligent, that she was exceedingly alert in all business matters, and that she was able to conduct a sustained conversation on any subject without her mind wandering. The cashier of the bank in which she deposited her money, referring to Mrs. Moore, testified: "I thought she was rather better than the average business man to transact business for herself." Drs. E. J. Page and W. C. Gilmour, who were Mrs. Moore's physicians during her last illness, and Dr. W. H. Flanigan, who had for many years been her family physician and was called in consultation the day before she died, expressed the opinion that she was capable of making a valid contract. Mrs. Moore, in 1903, sold her real property in Josephine County, where she had lived many years, and moved to Douglas County, where she purchased the farm in question, paying therefor $5,500; but missing the acquaintances with whom she had so long associated, and wishing to return to the neighborhood of her former home, she desired to sell this farm, and offered it for $7,000. The plaintiff, Mrs. Wolcott, who in 1905 lived in Douglas County, wrote to the defendant, who then lived in Josephine County: That their mother contemplated selling the farm; that she was growing feeble; and that, because she insisted upon living alone in a log house on the land, some of her neighbors thought she was not in her right mind, and believed that a person ought to be selected to look after her property. Replying to such letter, the defendant wrote that he thought that any deed their mother might make would be ineffectual, and would be set aside, upon her death, in a suit instituted by her heirs for that purpose. He further stated that, if the officials of Douglas

County should conclude to appoint a guardian for his mother, he would apply for the position.

The defendant went from his home in the summer of 1905 to visit his mother, and upon his return H. D. Norton, an attorney at Grant's Pass, mailed a typewritten letter to Mrs. Moore, inclosing a deed and a contract which were indited in the same manner. After detailing the substance of the agreement, the letter contains the further statement: "If the papers as drawn meet with your approval, kindly execute the same before Mr. Dimmick, who, I understand, is a notary public at Oakland, and forward the deed and copy of the contract to me and I will thereupon have Shelton (the defendant) execute the copy and will forward one to you for your keeping and thereupon deliver the deed and other copy of contract to him." Norton also wrote to Z. L. Dimmick, the notary, that, if Mrs. Moore called upon him for the purpose of having the instruments executed, he should summon a physician as a witness to ascertain whether or not she possessed sufficient mental capacity to make a valid contract. Mrs. Moore, having received the papers, took them, August 29, 1905, to Dimmick, who, complying with the instructions which he had received, called Dr. Gilmour to determine the inquiry suggested. The doctor concluded that she was competent, whereupon the papers were executed, placed in an envelope, directed to Norton, and given to Mrs. Moore, who mailed the package. Upon its receipt the attorney secured the defendant's signature to a duplicate of the contract and mailed it to her. The deed, however, was not recorded until November 2, 1905, and, except the defendant, none of Mrs. Moore's heirs were notified that she had made the conveyance.

Dr. Gilmour testified that he had visited Mrs. Moore professionally, and, having identified the deed and contract, the execution of which he witnessed, was asked what the grantor declared at that time, and replied: "Mrs. Moore said that she was entering into an agreement

with her son to take care of her during her lifetime, and
deeding him this place, and she says: 'I want to do this,
and I want you to see that I am capable of doing this
kind of business; that I know what I am doing. I want
you to understand this contract between Shelton and
myself.' And she says to me, 'Doctor, don't you think
that I know how to do business?' and I says, 'Yes, I think
you know how to do business as well as any one I know
of.'" Referring to the time the papers were signed, the
physician said, "The old lady's health for one of her age
was good." In answer to what he considered her then
mental condition to be, he further stated: "Well, I thought
she was fully abe to make a contract of that kind as any
one that I am acquainted with. She was bright mentally.
I know I got the impression that if any one gets ahead
of you, old girl, they will have to get up early in the
morning." Dimmick, the notary public, referring to
Mrs. Moore's mental condition when he took her acknowl-
edgement, said, "I felt that she was competent to trans-
act business."

The defendant testified that he visited his mother at
her solicitation, and she offered to convey the farm to
him if he would move to the premises and support her
during the remainder of her life, which testimony is
corroborated by his son, who was present during the con-
versation. The defendant further deposed that he knew
that his mother had made a will devising and bequeath-
ing her property, and he thought such testamentary dis-
position would invalidate any deed she might make to
the farm; but he informed her that, if Norton was of the
opinion that the signing of the will would not defeat her
conveyance of the land, he would accept the offer; that
he consulted about the matter with the attorney, and was
informed that the making of the will would not interfere
with a conveyance of the farm, whereupon the papers
were prepared and mailed to her by the attorney. The
defendant further stated that, when he made the con-

tract with his mother, she seemed fully to understand
what she was doing, and that, believing her mental capa-
city would be challenged, he suggested to the attorney
the necessity of securing a physician as a witness to the
execution of the deed.

The foregoing narrative, though quite brief as com-
pared with the volume of testimony given on this branch
of the case, we believe to be a sufficient statement of Mrs.
Moore's physical and mental condition at the time she
executed the deed. She was quite active for a person of
her advanced age. In business ventures she had been
successful, and the money which she possessed at the
time of her death was probably accumulated by carefully
saving small sums, and from the habit thus acquired she
undoubtedly was very frugal. Her memory, though not
retentive of recent trivial events, was nevertheless active,
for it will be borne in mind that she remembered a grand-
daughter whom she had not seen for 20 years. That
Mrs. Moore muttered and talked to herself is a circum-
stance from which intellectual impairment might be
inferred; but as it is a well-recognized fact that persons
who live alone, as she did much of the time, often give
oral expression to their thoughts, the existence of that
habit does not necessarily show such a degree of feeble-
ness of the mental faculties, resulting from old age, as
in her case to be designated as dotage. It appears that
Mrs. Moore permitted a small dog to remain in the house
which she occupied, and that she spat on the floor—
things which she would never have done or tolerated in
others about her home in her earlier life. The house in
which Mrs. Moore lived was very old, much dilapidated,
and the floor was probably in such a state of decay that
her sense of cleanliness was not shocked by the practice
which was attributed to her. As she lived alone much
of the time, she may have kept the dog in her home for
the protection which his watchfulness afforded, and par-
ticularly so since she at all times, as appears from the

testimony, kept some money hidden about the premises.
Under such circumstances, Mrs. Moore's custom of keep-
ing a dog in the house and of spitting on the floor cannot
be regarded as furnishing much evidence of any loss of
mental power.   After the attack of pneumonia which
Mrs. Moore had, she became irritable; but mere peevish-
ness and excitability of disposition do not of themselves
constitute proof of intellectual degeneracy: 16 Am. &
Eng. Enc. Law (2 ed.) 611.   Mrs. Moore was at times
afflicted with neuralgia, which affected her very much;
but, as these attacks occurred in the winter, as testified
by Dr. Flanigan, and were probably superinduced by cold
weather, she was evidently not inconvenienced by any
nerve affection in August, when the deed was executed.
We are satisfied that, though Mrs. Moore's old age was
accompanied by a natural enfeeblement of physical and
mental powers, yet the sagacity for which she had been
noted, and which she exercised in all business transac-
tions, remained intact until her death, evidencing an
unimpaired judgment, which, in all cases, is the criterion
of mental capacity.

The evidence shows that when Mrs. Moore purchased
the Douglas County farm she expressed an intention to
have the land conveyed to her daughters, the plaintiffs,
and to her son, the defendant; but instead, when the
deed was executed, she took the title in her own name.
For a share of the crops she leased the farm to her son-
in-law, Grant Ames, for a term to expire October 1, 1904.
During his tenancy a freshet carried away a part of her
fence, and because he refused to make the necessary
repairs, in consequence of which some of the crops were
destroyed by hogs, Mrs. Moore became angry at him,
moved from the dwelling house on the farm into an old
log cabin on the premises, and, beginning with the close
of his term, leased the land to another for one year. Mrs.
Moore, in the fall of 1904, moved to Oakland, where she
took a lease of a house and cared for herself until Jan-

uary 1, 1905, when her daughter, Mrs. Wolcott, also moved into the same dwelling, where she lived until July 1st of that year. As Mrs. Wolcott's husband was an invalid and unable to perform manual labor, the burden of supporting his family devolved upon his wife, and for this reason he seemed to be the object of resentment by his mother-in-law, who frequently remarked that she intended so to dispose of her property that neither he nor Ames could secure any of it, but that their wives should annually have the use of a part thereof for their respective lives. Mrs. Moore died, however, before consummating such a change in her last will and testament. The deed to the defendant was evidently made to effectuate her purpose of preventing Ames and Wolcott from enjoying any of her bounty, though she expected to reward their wives for the kind services they had rendered her. We believe that Mrs. Moore possessed sufficient intelligence to remember those that should have been the objects of her bounty, to comprehend the extent and character of her property, and to realize that the execution of the deed to the defendant would necessarily deprive her other residuary legatees of an equal distribution of her estate, and that she possessed an "active memory," rendering her competent to make a valid contract: *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891) ; *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846) ; *Dean* v. *Dean,* 42 Or. 290 (70 Pac. 1039) ; *Hamilton* v. *Holmes,* 48 Or. 453 (87 Pac. 154) ; *Owings* v. *Turner,* 48 Or. 462 (87 Pac. 160) ; *Reeder* v. *Reeder,* 50 Or. 204 (91 Pac. 1075).

2. The plaintiffs' counsel, in order to maintain the decree rendered in the case at bar, contend, in effect: That Mrs. Moore, by reason of extreme age, did not understand the nature or effect of her act, and never intended to execute an absolute deed; that she was persuaded to sign the instrument in consequence of the defendant's undue influence and misrepresentation which, in her enfeebled condition, she could not resist; that she was the victim of a

fraud practiced by her son, who obtained the conveyance for the consideration expressed in the contract; that the deed is void because it is founded upon an inadequate consideration, which, though specified, was never performed; and that the instrument never really went into effect.

The questions will be considered in the order stated. The testimony shows that, although Mrs. Moore could not well read ordinary manuscript, she could peruse printed matter. Hence since the deed, contract, and letter were typewritten, she surely understood the contents of these papers. It will be rememberd that, when she took these papers to Oakland, she stated, in the hearing of Dr. Gilmour, the purpose of her visit, and also detailed the substance of the deed and contract, thus conclusively, we think, proving that she understood the nature and effect of her act and evidencing her intention to execute an absolute deed.

3. The defendant, prior to August 29, 1905, stated to some of his relatives that, if he could secure a lease of his mother's farm for the term of her life, he would improve the premises and care for her during that time. After the deed was signed, he also explained to others that he had obtained a life lease of such land. These declarations, it is asserted by plaintiffs' counsel, tend to show that Mrs. Moore understood that she was leasing the farm to defendant, and not conveying it to him. The defendant's explanation of his assertions, as detailed, is that he understood his care for his mother during her life made the transaction equivalent to a lease of the premises for that term. His belief as to the legal effect of the deed and contract will not govern their interpretation, unless there was a mutual mistake in their execution, which evidently is not the fact. The deed was executed in the absence of the defendant, who had not seen his mother since he called upon her. What time intervened between such visit and the making of the

deed cannot be determined from the testimony with any
degree of accuracy. No evidence of any misrepresenta-
tions made by the defendant to his mother appears from
an inspection of the transcript. It is very doubtful if
he or any other person was capable of influencing her in
any manner, for she possessed to the last an indomitable
will. This trait of character is evidenced by the testi-
mony of Mrs. Wolcott, who, when interrogated concern-
ing her mother, deposed as follows:

"Q. Did you find that it was easy to persuade her in
various matters?"

"A. No, sir; I did not."

"Q. It is pretty hard to persuade her?"

"A. Yes, because I tried to persuade her to come back
here in Oakland, but she would not stay."

We believe Mrs. Moore's extreme age and enfeebled
condition did not prevent her from exercising an inde-
pendent judgment, since she deliberately determined to
exclude her sons-in-law, Ames and Wolcott, from parti-
cipating in the distribution of her property, and to convey
the farm to the defendant. A careful examination of
the testimony fails to disclose any fraud practiced by the
defendant upon his mother.

4. The remaining question is the validity of the deed,
which, it will be remembered, is challenged on three
grounds. The contract of a son or daughter to care for
and support parents during their lives, for a conveyance
of real property, is deemed an adequate consideration for
the land: Page, Cont. Section 224. If the terms of a
contract are faithfully executed by the grantee, the in-
timate relation existing between such parties prevents a
comparison of the worth of the property conveyed with
the value of the services stipulated to be performed:
Pomeroy's Eq. Juris., Section 962. For any substantial
failure in this respect, however, a court of equity will, in
a suit instituted for that purpose, set aside the agree-
ment of the parties and reinvest the title to the land in

the parent: *Thomas* v. *Thomas*, 24 Or. 251 (33 Pac. 565). In the case at bar, Mrs. Moore did not transfer all her property to the defendant, for it will be remembered that at her death she possessed $10,366, one-third of which sum, less the expenses of administration, Mrs. Ames and Mrs. Wolcott will receive. A person who is *sui juris* and has no creditors may make such disposition of his property by will or deed as he pleases, and, though expectant heirs may be disappointed by the distribution made by their ancestor, the law affords them no remedy for the frustration of the hopes which they entertained. We believe the consideration expressed in the deed and contract was sufficient.

5. The testimony shows that, after the agreement was consummated, the defendant immediately began making preparations to move to the farm, by disposing of his property and closing up his business in Josephine County, as required by the terms of the contract. Before he had completed such arrangements, however, his mother became ill and was taken to a neighbor's house. Upon receiving notice thereof, he instantly went to her, and she promised to remain where she then was until he could establish a home on the farm; but, after he left, her health being somewhat restored, she returned to the log house, where the defendant found her when he moved with his family, arriving two days prior to her death. The contract made it necessary for the defendant to maintain a separate room for his mother, beginning July 1, 1906; but he was required to commence caring for her as soon as he could conveniently adjust his business in Josephine County and move to the farm. He performed the consideration specified in the contract.

6. The deed, executed by his mother, was duly delivered to him soon after its execution, and such surrender effectuated a transfer of the title, though the deed was not immediately recorded.

7. Believing that Mrs. Moore on August 29, 1905, was competent to make a valid contract; that she was not induced by fraud or undue influence to execute the deed, and that the consideration therefor was adequate and fully performed, the decree is reversed, and the suit dismissed.    REVERSED: DISMISSED: REHEARING DENIED.

---

Decided July 20, 1909.