Argued September 20, affirmed October 24, 1916.

# MAGNESS *v.* DITMARS.

(160 Pac. 527.)

**Deeds—"Mental Capacity."**

1. "Mental capacity" at the time of signing a conveyance sufficient to comprehend the nature of the business in which the grantor is engaged is the standard fixed by the law for determining his competency.

**Deeds—Competency of Grantor—Sufficiency of Evidence.**

2. In suit involving the validity of a deed executed by defendant's father, evidence *held* to show that at the time of execution the father was mentally competent, knowing the nature of the business in which he was engaged, and fully understanding its effect.

[As to validity of deed of insane person executed before adjudication of insanity, see note in Ann. Cas. 1914D, 867.]

From Yamhill: Webster Holmes, Judge.

Department 1.    Statement by Mr. Justice Harris.

This is a suit by R. N. Magness against Hattie M. Ditmars, by Tillie Ditmars Kirkwood, general guardian of her person and estate, and Tillie Ditmars Kirkwood, as guardian *ad litem* of Hattie M. Ditmars. The facts are as follows:

John A. Ditmars and his wife, Tillie Ditmars, on July 19, 1899, deeded to James H. Shipley 80 acres of land, together with "a suitable right of way across the premises of" the grantors to the Dayton and Salem County road.   This suit involves the validity of that deed.   The plaintiff purchased the land from James H. Shipley, and alleges that John A. Ditmars was sane while the defendants claim that he was insane and not competent to execute the deed.   John A. Ditmars was committed to the Oregon State Insane Asylum on November 15, 1897, and was detained there until February 26, 1898, when he was released "upon six months' leave of absence."   He returned to his

farm, where he continued to reside with his wife; and afterward the asylum authorities made an entry in their records showing that he was discharged October 5, 1898, as cured.

At the time of his commitment to the insane asylum John A. Ditmars owned a farm which embraced 253 acres of land, including the 80 acres involved in this suit. He paid $1,000 on July 24, 1897, for 57 acres; he purchased the remaining 196 acres on October 12, 1897, from Damon E. Sawyer and wife for $2,610.36, and at the same time gave a note for $1,300 to A. J. Hunsaker and secured it by executing a mortgage on the 253 acres. The consideration for the deed to Shipley was $1,600, of which $600 was paid on or before the delivery of the conveyance, and Shipley and his wife gave a note to Ditmars for the remaining $1,000 and secured it with a mortgage on the land. Shipley entered into the possession of the 80 acres soon after the delivery of the deed. He improved the land, and subsequently sold the premises with the right of way to the plaintiff, R. N. Magness, on August 20, 1906, for $3,000. Magness has been in possession ever since he purchased the land, and he has made permanent improvements. Ditmars and wife gave a note to J. R. Forrest on October 14, 1899, for $1,400, and secured the paper by executing a mortgage on all the land then owned by them, and two days later the mortgage held by A. J. Hunsaker was satisfied.

John A. Ditmars was taken to a private sanatorium about May 1, 1900, but at the end of about three weeks he was committed to the Oregon State Insane Asylum, where he remained until his death, which occurred on February 4, 1901. He died intestate, leaving a widow, Tillie Ditmars, and a minor child, Hattie M. Ditmars, who was born in March, 1899. Tillie Ditmars was ap-

pointed administratrix of the estate of the deceased, and she was also appointed guardian of the person and estate of the minor daughter, Hattie M. Ditmars. James H. Shipley paid the $1,000 note which he had given to John A. Ditmars, and on December 19, 1901, the date of the payment, Tillie Ditmars, as administratrix of the estate of John A. Ditmars, duly satisfied the mortgage. Tillie Ditmars married again, and her name now is Tillie Ditmars Kirkwood. The note and mortgage from Ditmars and wife to J. R. Forrest were paid and satisfied on July 1, 1908. A dispute arose in 1911 between the Kirkwoods and Magness over the location of the right of way which had been provided for in the deed from the Ditmars to Shipley. The Kirkwoods attempted to prevent Magness from traveling over the way which had been previously used, and then on July 19, 1911, Magness commenced a suit against the minor child, her guardian, and the Kirkwoods, to enjoin them from interfering with his right to travel over the way which he had been using. The suit terminated on December 27, 1911, in a stipulated decree, which fixed the route of the way to be traveled. Afterward, in 1913, Hattie M. Ditmars, by her guardian, Tillie Ditmars Kirkwood, commenced an action in ejectment against R. N. Magness to recover the 80-acre tract which he had purchased from Shipley.

Magness answered, and then commenced this suit by filing a complaint in equity in the nature of a cross-bill and praying that the minor child be barred from claiming any interest in the land. After hearing the evidence the trial court found that John A. Ditmars was competent when he made the deed to Shipley, and decreed that Magness was the owner of the 80-acre tract and right of way. The defendant appealed.

AFFIRMED.

For appellants there was a brief over the name of *Messrs. McCain, Vinton & Burdett,* with oral arguments by *Mr. W. T. Vinton* and *Mr. James E. Burdett.*

For respondent there was a brief over the names of *Mr. Frank Holmes, Mr. Charles L. McNary* and *Mr. B. A. Kliks* with oral arguments by *Mr. McNary* and *Mr. Holmes.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1. Hattie M. Ditmars asserts that the deed which John A. Ditmars and wife executed on July 19, 1899, to James H. Shipley was invalid, for the reason that her father was, at that time, mentally incompetent, and that therefore she is the owner of the land as his daughter and heir. The daughter cannot successfully claim any interest in the land unless at the time of the execution of the deed her father did not comprehend the nature of the business. Mental capacity at the time of signing a conveyance sufficient to comprehend the nature of the business in which the person is then engaged is the standard fixed by the law for determining the competency of the person signing the document: *Carnagie* v. *Diven,* 31 Or. 366, 369 (49 Pac. 891) ; *Swank* v. *Swank,* 37 Or. 439, 445 (61 Pac. 846) ; *Wade* v. *Northup,* 70 Or. 569, 578 (140 Pac. 451).

2. We must now look to the evidence and ascertain whether, on July 19, 1899, John A. Ditmars knew the nature of the business in which he was then engaged, and fully understood the effect of the transaction. Some years prior to 1897 he contracted a disease which in turn produced general paresis. The medical witnesses agree that paresis is incurable; and, while it inevitably causes death, the patient will ordinarily

live from two to five years. The mind is never again normal after paresis seizes its victim, and consequently complete lucidity becomes impossible. While a recovery never occurs and rationality never again becomes normal, the patient may nevertheless pass through periods of remission, lasting from several weeks to months and occasionally for a year or more, during which it may be difficult or almost impossible to discover any trace of a deviation from normal mental health, and the patient can return to his affairs. Dr. W. T. Williamson, who was 17 years a physician at the Oregon State Insane Asylum and has made a study of nervous diseases for about 28 years, when a witness for the defendant, said that he believed "a person suffering from general paresis would be able to do business more or less, and whether he was competent to do any given thing would have to rest upon the proof of his competency at the time, adduced from a series of events." Dr. L. F. Griffith, who was a witness for plaintiff, expressed the opinion that the best method to determine the mental capacity of a paretic is to ascertain "whether he was reasonable in the ordinary affairs of life, his conduct about—going about the affairs of life in an ordinary, reasonable manner." When Ditmars was received at the insane asylum in 1897 the physical signs of the disease had not yet developed, and consequently the persons in charge could not, at that time, "make the diagnosis of general paresis." At first he was in a condition of mental excitement; but when he was released on February 26, 1898, his condition was much improved, and he had returned to "a comparatively sane condition of mind" and "had already entered a remission," and, in the opinion of Dr. L. F. Griffith, who has been connected with the asylum, except one year, since 1890, and was

a member of the medical staff in 1897 and 1898, ''he was capable to do ordinary things at that time.'' Soon after his return home he resumed the management of his farm, going about much as the ordinary person does; and, while he had ''spells'' which left him in a stupor on different occasions, he nevertheless continued to conduct the business of the farm until a comparatively short time before being taken to the private sanatorium in May, 1900.

James H. Shipley was a neighbor who lived ''about a couple of hundred yards from'' the Ditmars home. About ten days before the sale Ditmars asked Shipley if he ''wouldn't like to buy a piece of land,'' explaining to Shipley that:

''He had a mortgage on his own place, and if he could sell that piece of land when he got that he would turn it in on his own mortgage on the farm, and it would help him out to get some tools to farm with and other things he needed on the farm at the time.''

Shipley told Ditmars that he would make up his mind a little later, and the former testified that:

''The next time I met him down in the river bottom, he asked me, 'What about that trade?' and I told him we would go down the next Sunday and measure it off and look it over; so we did.''

In company with another person they measured off the land ''about where the line would come to.'' They agreed upon a price of $1,600, which was to be on terms of $600 cash and a note and mortgage for $1,000. The land was not reasonably worth more than the agreed price. Ditmars said the whole farm was leased, but Shipley told him if he ''could get possession, the price and terms was satisfactory.'' Shipley arranged with the lessee for possession of the land, and then ''told Ditmars I guessed we could trade and

make the deal," and paid $10 to apply on the purchase price. Ditmars and his wife, accompanied by Shipley and his wife, drove to McMinnville for the purpose of making a conveyance. When they arrived in town Ditmars and Shipley obtained a description of the 80-acre tract from a surveyor who had made a survey for Ditmars and an adjoining land proprietor. After obtaining a description of the land, they went to an office, where the conveyance was prepared. Ditmars and his wife signed the deed and received a check for $590, together with a note and mortgage for $1,000, signed by Shipley and wife. Ditmars cashed the check on the day he received it, and deposited $500 of the amount in a bank. Both the deed and the mortgage were filed for record within two hours of the time of delivery, and the Ditmars, accompanied by the Shipleys, then returned to their homes. John A. Ditmars neither said nor did anything unusual when going to or returning from McMinnville. The notary public who witnessed the deed and took the acknowledgment of the grantors testified that Ditmars "acted in a rational manner about signing the deed and answering questions as to whether he made it of his free will and accord," and "was sane and rational and in good condition to transact business." The second witness to the deed did not notice anything unusual. Shortly before the sale Ditmars told L. A. Byrd that "he was going to sell that piece of land; that would put him out of debt, and he would have plenty of land left." John Ross worked for Ditmars, and heard him say he was going to sell. Ditmars wanted to sell the 80 acres to Thomas Collinson, but the latter could not buy because he had no money, and two or three weeks later Ditmars told him that he had sold the property, and was satisfied with the sale. Frank Ditmars said that his

brother was running his own business in 1899, and that he noticed nothing peculiar with John after he came back from the asylum until about two weeks before the second commitment. Fifteen different witnesses, who had either worked for John A. Ditmars or around him, or had bought livestock from or had sold livestock to him, testified that he was sane or competent, or that he appeared rational, or that they noticed nothing peculiar about him.

Ditmars transacted important business both before and after the execution of the deed to Shipley. On October 12, 1897, Ditmars received the Sawyer deed, and at the same time executed the Hunsaker mortgage. The notary public who witnessed and took the acknowledgment of Sawyer to the deed did not notice anything wrong with Ditmars, and the person who acted as the second witness to the Sawyer deed and who also witnessed and as notary public took the acknowledgment of Ditmars to the Hunsaker mortgage testified that:

"During this transaction, Mr. Ditmars conducted himself in a rational way. I could see nothing wrong with the man's actions, and we talked over the business."

The Forrest mortgage was executed by Ditmars and his wife, on October 14, 1899, and at that time, according to the testimony of M. D. L. Rhodes, who acted as notary public and as a witness to that instrument, Ditmars comprehended the business; and Judge E. V. Littlefield, who also witnessed the mortgage testified that Ditmars "was competent to transact business," and "the question never entered my mind but what he was as sane as any man could be." This witness knew that Ditmars had been in the asylum, and on that account it is fair to assume that

any peculiar or unusal conduct on the part of Ditmars would have been noticed.

The evidence shows that John A. Ditmars comprehended the business in which he was engaged, and understood the nature and effect of the transaction when he signed the deed. He had a good reason for selling the land; he went about the business in a reasonable manner; and he received the full market value of the land. His mentality measured up to the gauge which both medical experts applied. He possessed a sufficient understanding to meet the test fixed by the law, and the deed to Shipley was therefore valid.

Although it is not necessary to proceed further with the discussion, yet a better understanding of the surroundings may be had if we again look at the record. Some light is thrown upon the attitude of Tillie Ditmars Kirkwood and the position now taken by the defendant when it is recalled that no assault was made upon the deed until the commencement of the action in 1913 to eject Magness; and no claim was ever made, or even intimated, that Ditmars was incompetent to sign the deed until 1911, when, according to the testimony of the plaintiff, Mrs. Tillie Ditmars Kirkwood told him that:

"If I went ahead with the suit [concerning the right of way] she would bring this suit against me for the property on the grounds that Ditmars was not capable of making a deed."

For a period of 12 years Mrs. Tillie Ditmars Kirkwood, the widow of the deceased, the administratrix of his estate and the guardian of his child, recognized the validity of the deed, not only by her failure to object, but also by her positive acts of approval. She signed the Forrest mortgage which excepted the 80 acres sold to Shipley; she affirmed the deed when she

satisfied the Shipley mortgage on December 19, 1901; she did not claim any right to the land as guardian, nor assert any interest in it as administratrix; and she acknowledged the validity of the deed when as an individual and as guardian she signed the stipulation which authorized the decree in the right of way suit for the very basis of the right to a way was the deed itself. She has never questioned the validity of the deeds conveying 253 acres to Ditmars in 1897, nor has she ever claimed that the Hunsaker and Forrest mortgages were invalid.

The decree is affirmed. ·                    Affirmed.

Mr. Chief Justice Moore, Mr. Justice Burnett and Mr. Justice McBride concur.