Argued at Pendleton October 28; affirmed December 15, 1931; rehearing denied January 26, 1932

LAUGHLIN *v.* LUDGATE ET AL.

(6 P. (2d) 20)

*Hugh E. Brady* and *Henry L. Hess,* both of La Grande (Hugh E. Brady and Green & Hess, all of La Grande, on the brief), for appellants.

*Woodson L. Patterson,* of Baker, for respondent.

BROWN, J. The facts in this case as shown by the record are substantially as follows:

In 1901, Alonzo Ludgate came to Union county, Oregon, to make his home, and he continued to reside in that county until the latter part of January, 1930, when he took up his residence in the home of Mabel C. Laughlin, this plaintiff, where he remained until he died on March 11 following. He was usually known as a bachelor, although he had once been married, and had two children residing in the state of Washington, who, at the time of the trial, were about 30 years of

age. He made the acquaintance of the plaintiff and her husband in 1910 while they were living with their family on a farm in the Clover Creek district near his home. Not only were they neighbors but they became close friends, and this friendship continued from that date until his death at the age of 73. Ludgate frequently worked for plaintiff's husband, and during such times lived at the Laughlin home. He made a will in plaintiff's favor in 1925.

It appears that, in 1921, plaintiff procured a divorce from her husband, and, since that time, has resided in Baker where she has supported herself and reared her family of four children by her earnings as a teacher of music, having established classes in Baker and surrounding towns.

In the summer of 1929, Ludgate executed a will in favor of one Unzicker, a neighbor. On or about August 21, 1929, he entered Hot Lake Sanitorium for medical attention. After remaining for several weeks he left, but returned in a short time. About the second week in November he again left, and went to live at the Unzicker home, where he remained until December 20, when he went back to his own home. It appears that, during Ludgate's stay at the Sanitorium, this plaintiff, while attending to her music class in Union, learned of her old neighbor's illness and drove to Hot Lake to visit him. She was present when a surgical operation was performed upon his body, and called to see him nearly every day thereafter until his convalesence was assured. On January 6, 1930, she received a letter from Ludgate, in which he enclosed a will executed on that date in her favor. The following Sunday she, with one of her sons, called on Ludgate at his home. In the course of the visit Ludgate asked her if she would undertake the care of him for the balance of his life,

and, in the event of illness, allow him to come to her home in Baker and live as a member of her family and be treated as her own father; if she would supply him with clothing, medical attention and care, and, upon his death, cause him to be buried at Island City and pay all just debts, including funeral expenses, in exchange for which he would convey to her all of his property. He told her that the will which he had already made, executed and delivered to her was all that was necessary upon his part to convey his property to her, and that this will could be exchanged for a deed. In due time his offer was accepted. She stated to him, however, that she did not think a will could be exchanged for a deed, and he requested her to secure the services of some good lawyer. She later consulted with W. H. Strayer, a well-known lawyer of ability and integrity, who confirmed her statement in the matter. On January 31, 1930, Joe Harrison, a neighbor, at Ludgate's request telephoned plaintiff to the effect that Ludgate was ill and wished her to come to Island City and take him to her home in Baker. She took him into her home and gave him care, first taking him to Dr. C. J. Bartlett of Baker for examination and treatment. Dr. Bartlett made frequent calls upon him, and he improved temporarily and made another trip to Island City. He was frequently up and about the plaintiff's home, had sufficient strength to visit the barber shop, ate his meals, read the daily papers, and received many visits from his friends. Some days after his arrival at her home, he asked her if she had seen a lawyer about the will, and she told him of her conference with Senator Strayer. Thereupon, he requested that she have Attorney Strayer prepare a deed. He prepared the deed and a bill of sale, and personally called upon Mr. Ludgate at plaintiff's home on February 11, 1930,

and took his acknowledgment to the deed. That the omission from the deed of a small tract of 7.9 acres was a mutual mistake of the grantor and the grantee is alleged in the complaint and fully established by the testimony of Senator Strayer.

■ Let us examine the testimony in relation to the mental capacity of Ludgate at the time of the execution of the deed in question.

Joe Harrison, long an intimate friend of Ludgate, testified that he lived as a near neighbor to Ludgate continuously for 11 years, and that Mr. Ludgate frequently took meals at his home; that he visited Ludgate many times—about every day—while he was a patient at Hot Lake; that he called upon him before and after his operation, and that Ludgate was all right mentally; that after Ludgate returned from Hot Lake he saw him frequently at Unzicker's, and still later, after Ludgate had moved back to his own place, he saw him very often. This witness also called at the plaintiff's home to see Ludgate, and he makes it plain that Ludgate seemed to be perfectly sane and like any other normal person 73 years of age.

Harrison's wife testified that she had been personally acquainted with Ludgate, for a number of years; that she frequently visited him at Hot Lake and saw him almost every day after he returned from that place; that she, in company with her husband, visited him at the plaintiff's home in Baker, and that, in her opinion, Ludgate was at no time incompetent to transact business.

Mrs. Reece McAlister testified that she was acquainted with Ludgate, and that she frequently saw him; that she and her husband visited him at Hot Lake after his operation, and that he was at her home after

he left the Sanitorium. She testified that, from her observation and association with Ludgate, it was her opinion that he was perfectly normal.

J. O. Anson testified that he had been acquainted with Ludgate for 26 or 27 years, and had known him intimately since about 1920; that he had purchased horses and cattle from Ludgate, and that throughout their transactions Ludgate was capable of looking after his business affairs. In fact, witness testified, "If you beat him on a horse trade, you had to get up early in the morning." This witness further testified:

"The first time I seen him after he came home (from Hot Lake,) he walked up from the Unzicker place, which I should judge would be about 4 miles. * * *

"Q. He walked over to your place? A. Yes, and settled a pasture bill. When he went to Hot Lake his horses, two of them, were in my pasture, and someone took them out, and he came over and settled it with my wife. He had it figured, and I said it was all right, just then I came home. * * *

"I think he visited my place two or three times while he was at Mr. Unzicker's place. * * * I figured he was good mentally—just as bright as ever, I believe."

Witness also visited Ludgate two or three times after he went to plaintiff's home at Baker, spending four hours with him on the first visit and half an hour on the second. He testified that during these visits "he talked just like he always did—just the same. I didn't see any difference only he was weak."

W. H. Strayer, the attorney who prepared the documents whereby Ludgate disposed of his real and personal property, testified that he, in company with M. B. Strayer, his son and law partner, took the papers

to plaintiff's home to have them executed by Ludgate, and that on that occasion he visited with Ludgate for perhaps half an hour. He further testified:

"Q. You say you had casually known Mr. Ludgate for a good many years? A. I had known him casually I would say for fifteen years, and Mrs. Laughlin for perhaps three or four years.

"Q. How was his appearance at that time,—his general appearance as to his health? A. Other than the fact that he was in bed, he appeared to me just the same as he always had; talked the same; his memory was the same.

"Q. During the last several years had he aged rapidly, or how did he appear? A. I couldn't see any very great change in him."

M. B. Strayer testified that, at the time of the execution of the writings, Ludgate "was in possession of his natural faculties," and that "he made a normal response in his conversation."

The record reveals much more testimony of like import. But further evidence of this character is deemed unnecessary to a decision of the case. In the judgment of the writer, the record clearly establishes that Ludgate was competent to transact his business at the time he executed the instruments involved herein. The defense has utterly failed to prove the allegations of his weakened mentality. Upon the other hand the witnesses, friends and old-time neighbors of Ludgate, took the stand and testified that at the age of 73 years he was mentally competent to handle his business. J. R. Oliver, who had prepared two wills for Ludgate, being called on behalf of the defendants, testified that he had known Ludgate for many years, and that he appeared to be a man of judgment, who knew what he wanted.

The opinion of Dr. W. T. Phy, of Hot Lake, and Dr. C. J. Bartlett, of Baker, physicians and surgeons of skill and ability, as to the mental capacity of Ludgate at the time of the execution of the deed and bill of sale in question are widely at variance. Dr. Phy attended the patient while at Hot Lake Sanitorium during the autumn of 1929. Dr. Bartlett was Ludgate's attending physician from the time of his arrival at Baker about the last of January, 1930, until his death on March 11th following, during which time he "made about twenty visits to see him." In the light of these facts, we believe that the physician last named was better able to judge of the condition of his patient's mentality on February 11, 1930, the date of the execution of the instruments in question, than was the other, who had not seen Ludgate since his departure from the Sanitorium almost three months prior thereto. Dr. Bartlett testified, "I think his capacity was average to transact business"; and the record shows no actuating motive for unfairness on the part of this witness. We do not find or charge, as does the plaintiff, that Dr. Phy, the surgeon who operated upon the body of Ludgate and removed his prostate gland, was actuated by any sinister motive in testifying that, in his opinion, Ludgate was mentally incapable of transacting his business. However, the plaintiff seems to have based her assertion in this regard upon the fact that a few days after the operation Ludgate was handed a statement for $727 covering all charges, including a fee of $500 for the surgical operation performed by Dr. Phy, which he paid, and that shortly after he left the hospital he received an amended statement showing a charge of $1,000 for the surgical operation, with a five hundred dollar payment credited

thereon. We do not cast any aspersions upon the testimony given by Dr. Phy. But, from our consideration of the evidence adduced by the respective parties hereto, we find that the weight of the proof is against the defendants' averments that the decedent was mentally incompetent and therefore incapable of transacting business when he executed the instruments in question.

The question as to what constitutes mental capacity to make a will or deed has often been before this court. In the case of *Rowe v. Freeman*, 89 Or. 428, 436 (172 P. 508, 174 P. 727), Mr. Justice McCamant, in delivering the opinion for the court, said:

"A party of normal mentality is entitled to dispose of his own in such manner as he sees fit. *Carnagie v. Diven*, 31 Or. 366, 368 (49 P. 891); *Dean v. Dean*, 42 Or. 290, 299 (70 P. 1039); *Reeder v. Reeder*, 50 Or. 204, 206 (91 P. 1075); *Deckenbach v. Deckenbach*, 65 Or. 160, 165 (130 P. 729); *Wade v. Northup*, 70 Or. 569, 578 (140 P. 451)."

In the opinion denying petition for rehearing, the following maxim laid down in the case of *Soper v. Cisco*, 85 N. J. Eq. 165 (95 Atl. 1016, Ann. Cas. 1918B, 452), was quoted and approved:

"The test of mental capacity to make a deed is that a person shall have ability to understand the nature and effect of the act in which he is engaged and the business which he is transacting."

In *Carnagie v. Diven*, 31 Or. 366 (49 P. 891), cited in support of the holding in the Rowe case, the grantor named in the deed was 83 years of age and died the day following the execution of the deed. See, also, *Ames v. Moore*, 54 Or. 274 (101 P. 769); *Magness v. Ditmars*, 81 Or. 598 (160 P. 527); *Graham v. Allen*, 116 Or. 501 (241 P. 1007).

■ Now taking up the assertion of the defendants that the plaintiff exercised undue influence upon the mind of Ludgate in the matter of the execution by him of the papers involved in this case.

■ It has been held by this court time and again that, where a litigant seeks to annul a conveyance on the ground of undue influence, the evidence must show the influence so great as to overcome the will of the grantor. In *In re Darst's Will*, 34 Or. 58, 65 (54 P. 947), the question was at issue, and the court made the following pronouncement as to what constitutes undue influence:

"Influence arising from gratitude, affection, or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition, and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts: *Gardiner v. Gardiner*, 34 N. Y. 155; *Dean v. Negley*, 41 Pa. St. 312, 80 Am. Dec. 620; * * * *Trumbull v. Gibbons*, 22 N. J. Law, 117, 51 Am. Dec. 253 * * *."

We also direct attention to the following concise expression set down in the case of *Estate of Allen*, 116 Or. 467, 500 (241 P. 996), where the subject was again before the court:

"Undue influence is measured, not by degree, but by effect. If it destroys free agency, it is undue. Moreover, the undue influence that constrains must be present operating upon the mind of the testator in the very act of making the will: *In re Shaw's Will*, 11 Phila. [Pa.] 51."

See, also, *In re Turner's Will*, 51 Or. 1, 8 (93 P. 461); *In re Diggin's Estate*, 76 Or. 341, 346 (149 P. 73);

*Rice v. Rice,* 95 Or. 559, 563 (188 P. 181) ; *In re Riggs' Estate,* 120 Or. 38 (241 P. 70, 250 P. 753) ; *In re Will of Robert Carr,* 121 Or. 574 (256 P. 390).

In 18 C. J., at page 237, on the subject of undue influence in relation to deeds, the editors have written:

"Neither can undue influence be predicated on mere opportunity for its exercise. The unreasonableness of a conveyance is not of itself sufficient to show undue influence. The law does not recognize stress of circumstances, whether existing alone or in conjunction with undue influence, as a ground for setting aside a deed."

Further citation of like import we deem unnecessary.

From a deliberate consideration of all the facts of record herein and the law applicable thereto, we are satisfied that the plaintiff is entitled to the relief prayed for in her complaint. We therefore affirm the decree of the lower court.

Neither party shall recover costs in this court.

ROSSMAN and CAMPBELL, JJ., not sitting.